**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **ASSOCIATION OF IRRITATED RESIDENTS, an Unincorporated Association,** | ) ) ) | CIV F 054-0707 AWI SMS |
| **Plaintiff,** | ) ) | **ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| **v.** | ) ) ) | |
| **FRED SCHAKEL DAIRY, a California Proprietorship, FRED SCHAKEL, owner and operator, and SCHAKEL FAMILY PARTNERSHIP, a California Limited Partnership, owner and operator,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) ) | |

This is a Clean Air Act ("CAA") case brought by Plaintiff Association of Irritated Residents ("AIR") against Defendants Fred Schakel Dairy, Fred Schakel, and Schakel Family Partnership (collectively "Schakel"). AIR alleges that Schakel violated both California's State Implementation Plan and express provisions of the CAA when Schakel began construction of the Fred Schakel Dairy without obtaining a clean air construction permit from the San Joaquin Valley Unified Air Pollution Control District ("the District"). Schakel has filed a Rule 12(b)(6) Motion to Dismiss. For the reasons that follow, the motion will be denied.

**FACTUAL BACKGROUND**[1]

On December 17, 2003, Schakel obtained approval for a special use permit from the Tulare

County Planning Commission in order to construct/create the Fred Schakel Dairy ("the Dairy").

First Amended Complaint ("FAC") at ¶ 42. On December 18, 2003, Schakel recorded acceptance

of the conditions of approval and agreed to comply with the conditions within the use permit. Id.

One condition of the use permit is that, "to the extent that an air quality permit is required by [the

District] (or by any other public entity) pursuant to SB 700 (Florez) or any other air quality law, then

such permits shall be obtained by the applicant and the applicant shall comply therewith." Special

Use Permit No. PSP 98-061 at ¶ 36.[2] The use permit also limits the number of Holstein milk cows

to 5,832 head and limits the number of support stock (non-lactating "dry cows" and heifers) to 5,058

head. Id. at ¶ 1; FAC at ¶ 42.

On January 6, 2004, Schakel obtained building permits for the Dairy and obtained a building

permit for a manure separator pit on November 1, 2004. FAC at ¶ 43. Schakel began actual

construction on the Dairy on or after January 6, 2004. Id. Schakel has begun to construct the Dairy

to achieve the maximum operational capacity as set by the use permit. Id. at ¶ 44. Schakel has

constructed, or is in the process of constructing, eight freestall barns, four manure solid separation

lagoons, two liquid manure storage lagoons, corrals with flushed alleys for support stock, a milking

barn, and feed storage facilities. Id. These components constitute the Dairy facility. Id. The Dairy

also has at least one diesel internal combustion engine that is greater than 50 horsepower. Id. at

---

[1]The factual background is taken from Plaintiff's First Amended Complaint since the factual allegations in the operative complaint are deemed to be true for purposes of a Rule 12(b)(6) motion. See Johnson v. Knowles, 113 F.3d 1114, 1116 n.2 (9th Cir. 1997).

[2]Plaintiff requests that the Court take judicial notice of the use permit and acceptance by Schakel, which were filed by Schakel with the Tulare County Recorder on December 18, 2003. No opposition to this motion for judicial notice has been filed. A court shall take judicial notice of an appropriate fact if requested by a party and supplied with the necessary information. Fed. R. Evid. 201. Judicially noticed facts often involve matters of public record, records of state entities, and proceedings in other courts, either State or Federal. See Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F.3d 861, 866 n.1 (9th Cir. 2004); United States v. Southern Cal. Edison Co., 300 F.Supp.2d 964, 974 (E.D. Cal. 2004). Plaintiff's motion for judicial notice with respect to the use permit and acceptance filed by Schakel with the Tulare County Recorder on December 18, 2003, is granted.

2

¶ 63.  The Dairy facility will occupy 256 acres.  Id. at ¶ 44.  Fred Schakel and the Schakel Family Partnership own and operate the Dairy.  Id. at ¶ 17.

Each of the eight freestall barns is 750 feet long and 102.5 feet wide and is equipped with a system that uses wastewater from the liquid manure storage lagoons to flush the manure from the freestall barns.  Id. at ¶ 51.  The barns's flush system captures 80% or more of the 5,832 milk cows's urine and feces and flushes the waste to the liquid manure storage lagoons.  Id.  The milk cows will be milked three times per day in a centrally located milking barn, which is equipped with a flush system similar to the freestall barns except that fresh water is used to flush the cows's waste to the liquid manure storage lagoon.  Id. at ¶ 52.  The support stock will be confined in open, dirt lined corrals that are equipped with a flush system on concrete lined feed alleys.  Id. at ¶ 53.  The corrals's flush system captures 60% or more of the 5,058 support stock's urine and feces and flushes the waste to the liquid manure storage lagoons.  Id.

The dairy has four solid separation lagoons where suspended solids in the liquified waste settle out of the waste stream.  Id. at ¶ 54.  Each solid separation lagoon is 1,200 feet long and approximately 50 feet wide.  Id.  The dairy has two liquid manure storage lagoons, one measuring 400 feet wide by 1,000 feet long and the other measuring 400 feet wide by 650 feet long.  Id.  The total volume of liquified waste storage is 10,024,848 cubic feet.  Id.  Liquified manure from the freestall barns and flushed alleys will enter the solid separation lagoons, from which a portion of the manure solids will be removed and composted, and the two liquid manure storage lagoons will store the remaining liquified waste.  Id.  The liquid manure storage lagoons will also contain manure-contaminated wastewater and stormwater.  Id.  The dairy will use the liquified waste from the liquid manure storage lagoons as fertilizer for crops (alfalfa, wheat, and corn silage) grown on 1,550 acres.  Id. at ¶ 56.  Feed will be stored at the southeast corner of the dairy facility, and solid manure will be shipped off-site for use as fertilizer at nearby farming operations.  Id.

A 1,000 pound dairy cow produces the waste of approximately 20 people.  Id. at ¶ 50.  With reference to the California Regional Water Quality Control Board – Central Valley Region's animal

1 unit system, the total animal units allowed by Schakel's use permit is 13,419.8.[3]  Id. at ¶ 48.  Using

2 this animal units number, the dairy has the potential to produce the equivalent manure waste of a city

3 of nearly 275,000 people.  Id. at ¶ 50.

4          Dairy cows emit volatile organic compounds (VOC) directly from their bodies's digestive

5 system, which are referred to as enteric emissions.  Id. at ¶ 57.  Urine and feces ("manure") from

6 dairy cows emit VOC immediately after excretion in the freestall barns.  Id. at ¶ 58.  Decomposing

7 manure also emits VOC while in the solid separation lagoons and liquid manure storage lagoons, in

8 corrals, and in solid manure composting piles.  Id.  Of the various compounds defined as VOC under

9 District and U.S. Environmental Protection Agency ("EPA") rules, dairy cows emit many defined

10 VOCs including amines, phenols, volatile fatty acids, and methanol.  Id. at ¶ 59.  Decomposing feed

11 also emits VOC.  Id. at ¶ 60.  The enteric emissions from cows in the freestall barns and the milking

12 barn, emissions from decomposing feed, and emissions from decomposing manure in the manure

13 lagoons and compost piles can reasonably pass through a stack, chimney, vent or other functionally

14 equivalent opening.  Id. at ¶¶ 60-62.  In other words, the diary emits VOC from manure

15 decomposition, enteric processes, and feed decomposition, and also emits oxides of nitrogen ("NO")

16 from stationary diesel internal combustion engines.  Id. at ¶ 5.  The dairy has the potential to emit

17 VOC and NO at a rate that exceeds 25 tons per year.  Id. at ¶ 67.  The freestall barns and milking

18 barn, the liquid manure storage lagoons, the solid manure storage piles, and the feed storage unit

19 each have the potential to emit VOC at a rate greater than 2 lbs. per day.  Id. at ¶¶ 78-81.  The diesel

20 internal combustion engine has the potential to emit NO at a rate greater than 2 lbs. per day.  Id. at

21 ¶ 82.

22          On August 10, 2005, AIR filed its First Amended Complaint and alleged two causes of

23 action.  The first cause of action is a citizen suit under 42 U.S.C. § 7604(a)(3).  AIR alleges that the

24 dairy is a "stationary source" and a "major stationary source" and that Schakel violated, and

25

26          [3]The Water Control Board classifies dairy cattle in such a way that one animal unit equals a 1,000 pound
cow; thus, one Holstein cow equals 1.4 animal units, a dry cow equals 1.12 animal units, and a heifer greater than 1
27 year old equals 1.02 animal units.  See FAC at ¶ 48.

28                                                    4

continues to violate, Part D of Title I of the CAA because Schakel began actual construction without

obtaining a New Source Review permit, without installing Best Available Control Technology,

without purchasing offsets, and without performing an alternative site analysis. Id. at ¶ 68.  The

second cause of action is a citizen suit under 42 U.S.C. § 7604(a)(1).[4]  AIR alleges that Schakel has

violated District Rules 2010 and 2201, which have been approved by the EPA as part of California's

State Implementation Plan.  Similar to the first cause of action, AIR alleges that Schakel has failed

to obtain an Authority To Construct permit from the District, has not installed Best Available

Control Technology, has not purchased emission reduction credits, and has not conducted an

alternative siting analysis. Id. at ¶¶77-84.  AIR seeks declaratory and injunctive relief, the imposition

of civil fines, and attorney's fees.  On September 8, 2005, Schakel filed this Rule 12(b)(6) motion.

## TIMELINESS OF THE RULE 12(b)(6) MOTION

In opposition to Schakel's motion, AIR initially argues that Schakel's motion is not timely.

Because Schakel executed a Rule 4 waiver of service, AIR argues that under Rule 12(a)(1)(B)

Defendant had 60 days from the date of the request for waiver in which to file a Rule 12 motion.

Plaintiff's argument has no merit.  Rule 12(a)(1) sets time limits in which to file an answer,

either 20 days after service of the summons and complaint or 60 days after a Rule 4(d) waiver

request is sent if service is then waived.  Fed. R. Civ. Pro. 12(a)(1).  However, the Ninth Circuit

"allows a motion under Rule 12(b) any time before the responsive pleading is filed," even if filed

---

[4]42 U.S.C. § 7604(a)(1) and (3) in relevant part read:

Except as provided in subsection (b), any person may commence a civil action on his own behalf--
(1) against any person (including (I) the United States, and (ii) any other governmental instrumentality or agency to
the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is
evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation
under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,
. . . . . . .

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a
permit required under part C of title I (relating to significant deterioration of air quality) or part D of title I (relating
to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated)
or to be in violation of any condition of such permit.

5

outside the time limits of Rule 12(a)(1). Aetna Life Ins. Co. v. Alla Medical Services, Inc., 855 F.2d 1470, 1474 (9th Cir. 1988); Bechtel v. Liberty National Bank, 534 F.2d 1335, 1340-41 (9th Cir. 1976); Reiffen v. Microsoft Corp., 158 F.Supp.2d 1016, 1031-32 (N.D. Cal. 2001) ("Moreover, a defendant may file a FRCP 12(b) motion any time before a responsive pleading (i.e. an answer) is filed."). If a Rule 12(b) motion is filed before an answer, it is timely. See Aetna Life Ins., 855 F.2d at 1474. As no answer has been filed in this case, Defendant's Rule 12(b)(6) motion is timely. Id.

## RULE 8 PLEADING

Federal Rule of Civil Procedure 8 sets the pleading standard for claims for relief. "Under the liberal rules of pleading, a plaintiff need only provide a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Sagana v. Tenorio, 384 F.3d 731, 736 (9th Cir. 2004) (quoting Fed. R. Civ. P. 8(a)). This rule does "not require a claimant to set out in detail the facts upon which he bases his claim." Conley v. Gibson, 355 U.S. 41, 47 (1957). The pleadings need only give the opposing party fair notice of a claim and the claim's basis. Conley, 355 U.S. at 47; Sagana, 384 F.3d at 736; Fontana v. Haskin, 262 F.3d 871, 877 (9th Cir. 2001). 47). The pleadings are to "be construed as to do substantial justice," and "no technical forms of pleading . . . are required." Fed. Rules Civ. Pro. 8(e)(1), (f); Sagana, 384 F.3d at 736; Fontana, 262 F.3d at 877.

## RULE 12(b)(6) STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This rule provides for dismissal of a claim if, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Parks Sch. of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). Thus, the determinative question is whether there is any set of "facts that could be proved consistent with the allegations of the complaint" that would entitle plaintiff to some relief. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002). In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-

moving party. <u>Newman v. Sathyavaglswaran</u>, 287 F.3d 786, 788 (9th Cir. 2002); <u>Vignolo v. Miller</u>, 120 F.3d 1075, 1077 (9th Cir. 1999). The Court must also assume that general allegations embrace the necessary, specific facts to support the claim. <u>Smith v. Pacific Prop. and Dev. Corp.</u>, 358 F.3d 1097, 1106 (9th Cir. 2004); <u>Peloza v. Capistrano Unified Sch. Dist.</u>, 37 F.3d 517, 521 (9th Cir. 1994). But, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001); <u>see also</u> <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003); <u>Western Mining Council v. Watt</u>, 643 F.2d 618, 624 (9th Cir. 1981). Courts will not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." <u>Warren</u>, 328 F.3d at 1139; <u>Western Mining Council</u>, 643 F.2d at 624. Furthermore, Courts will not assume that plaintiffs "can prove facts which [they have] not alleged, or that the defendants have violated . . . laws that have not been alleged." <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983).

In deciding whether to dismiss a claim under Rule 12(b)(6), the Court is generally limited to reviewing only the complaint, but may review materials which are properly submitted as part of the complaint and may take judicial notice of public records outside the pleadings. <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688-89 (9th Cir. 2001); <u>Campanelli v. Bockrath</u>, 100 F.3d 1476, 1479 (9th Cir. 1996); <u>MGIC Indem. Corp. v. Weisman</u>, 803 F.2d 500, 504 (9th Cir. 1986). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir. 2001); <u>Balistreri v. Pacifica Police Dep't.</u>, 901 F.2d 696, 699 (9th Cir. 1988). If a Rule 12(b)(6) motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting <u>Doe v. United States</u>, 58 F.3d 494, 497 (9th Cir. 1995)). In other words, leave to amend need not be granted when amendment would be futile. <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 898

7

(9th Cir. 2002).

## REGULATORY FRAMEWORK

### *The Clean Air Act*

Congress passed the CAA to protect and to enhance the quality of air resources and to promote the health, welfare, and productive capacity of the nation. 42 U.S.C. § 7401; California v. United States, 215 F.3d 1005, 1007 (9th Cir. 2000). The CAA creates a framework for the "development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." 42 U.S.C. § 7401(a)(4); Hall v. United States Environmental Protection Agency, 273 F.3d 1146, 1153 (9th Cir. 2001). The CAA requires that the EPA publish a list of air pollutants and promulgate health based standards, known as the National Ambient Air Quality Standards ("NAAQS"), that set the maximum permissible concentrations in the ambient air for each listed air pollutant. 42 U.S.C. §§ 7408(a), 7409(a); Vigil v. Leavitt, 366 F.3d 1025, 1029 (9th Cir. 2004); Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n, 366 F.3d 692, 695 (9th Cir. 2004); Council of Sacramento v. Slater, 184 F.Supp.2d 1016, 1019 (E.D. Cal. 2000). Each state has primary responsibility for assuring air quality, and the CAA requires each state to adopt a State Implementation Plan ("SIP") in order to meet NAAQS requirements. 42 U.S.C. §§ 7407(a), 7410(a); Vigil, 366 F.3d at 1029; Bayview Hunters Point, 366 F.3d at 695; Hall, 273 F.3d at 1153. Specifically, each state is required "to adopt a 'plan which provides for implementation, maintenance, and enforcement' of the ambient air quality standards and to submit its SIP to the EPA for approval. Each SIP must include enforceable emission limitations and other control measures necessary to attain the NAAQS, as well as timetables for compliance." 42 U.S.C. § 7410(a)(2)(A); Bayview Hunters Point, 366 F.3d at 695; see also Vigil, 366 F.3d at 1029.

In order to provide for federal oversight of state efforts to meet NAAQS requirements, "SIPs are subject to EPA review and, if inadequate, disapproval." Hall, 273 F.3d at 1153; see Bayview Hunters Point, 366 F.3d at 695. The EPA may "not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further

progress ... or any other applicable requirement of [the Act]." 42 U.S.C. § 7410(l); <u>Hall</u>, 273 F.3d at 1155. However, the CAA does allow for "state and local governments to adopt and enforce their own air quality standards and limitations provided that the requirements are no less stringent than those prescribed by the federal government." <u>California</u>, 215 F.3d at 1007 (citing 42 U.S.C. § 7416). Additionally, States must provide the EPA with "necessary assurances" that the appropriate State agencies will have "adequate personnel, funding, and authority under State . . . law to carry out [the SIP]." 42 U.S.C. § 7410(a)(2)(E)(I).

Once a SIP is "adopted by a state and approved by the EPA, [it] becomes controlling and must be carried out by the state." <u>Bayview Hunters Point</u>, 366 F.3d at 695; <u>Beentjes v. Placer County Air Pollution Control Dist.</u>, 254 F.Supp.2d 1159, 1162 (E.D. Cal. 2003) ("[a SIP's] requirements and commitments become binding upon the state as a matter of federal law."). "Approved SIPs are enforceable by either the State, the EPA, or via citizen suits brought under [42 U.S.C. § 7604(a)]." <u>Bayview Hunters Point</u>, 366 F.3d at 695; <u>see also</u> <u>Grand Canyon Trust v. Tucson Elec. Power Co.</u>, 382 F.3d 1016, 1020-21 (9th Cir. 2004). However, "courts may only enforce specific SIP strategies, and may not enforce a SIP's overall objectives or aspirational goals." <u>Bayview Hunters Point</u>, 366 F.3d at 701. If a state does not submit a SIP or does not submit a satisfactory SIP to the EPA, the EPA is obligated to promulgate a Federal Implementation Plan under 42 U.S.C. § 7410(c). <u>Vigil</u>, 366 F.3d at 1039.

Regions within a state are "designated as either 'attainment' or 'non-attainment' areas, depending upon whether they meet the NAAQS for a particular pollutant." <u>Slater</u>, 184 F.Supp.2d at 1019. The CAA requires that each SIP include a permit program for non-attainment areas to regulate the construction and operation of proposed new or modified major stationary sources of pollutants. 42 U.S.C. § 7502(c)(5); <u>Greenbaum v. EPA</u>, 370 F.3d 527, 531 (6th Cir. 2004); <u>Oregon Envtl. Council v. Oregon Dep't of Environmental Quality</u>, 775 F. Supp. 353, 356 (D. Or. 1991). This permitting program is known as New Source Review ("NSR"). <u>Greenbaum</u>, 370 F.3d at 531. "Basically, the program requires new or modified sources of pollutants to obtain a permit that

1  requires certain pollution controls and other measures to ensure that the new or modified source will

2  not exacerbate the pollution problem in the area." Id.  States may issue a permit for the construction

3  of a new or modified major stationary source if:  the new or modified major stationary source is

4  required to comply with the Lowest Achievable Emission Rate ("LAER"); an analysis of alternative

5  sites, sizes, production processes, and environmental control techniques for the proposed source

6  demonstrates that the benefits of the proposed source significantly outweigh its environmental and

7  social costs; and offsetting emissions reductions are obtained.  42 U.S.C. § 7503(a); see Louisiana

8  Environmental. Action Network v. EPA, 382 F.3d 575, 578 (5th Cir. 2004); Oregon Envtl., 775

9  F.Supp. at 356.

10      Ozone, which contains 1-hour and 8-hour standards, and NO are identified pollutants within

11  the NAAQS.  40 C.F.R. §§ 50.9, 50.10, 50.11; Louisiana Envtl, 382 F.3d at 578 n.1.  The CAA

12  divides ozone non-attainment areas into five classes based on the severity of ozone pollution:

13  marginal, moderate, serious, severe, and extreme.  42 U.S.C. § 7511(a)(1); Louisiana Envtl., 382

14  F.3d at 578.  Whether a source is properly classified as a "major stationary source" is determined by

15  the non-attainment classification of the source's location and the source's potential to emit

16  pollutants.  42 U.S.C. § 7511a.  For sources located in "extreme non-attainment areas" for ozone,

17  a major stationary source "includes (in addition to the sources described in [42 U.S.C. § 7602]) any

18  stationary source or group of sources located within a contiguous area and under common control

19  that emits, or has the potential to emit, at least 10 tons per year of [VOC]."[5]  42 U.S.C. § 7511a(e).

20  In pertinent part, "potential to emit" means "the maximum capacity of a stationary source to emit

21  a pollutant under its physical and operational design." 40 C.F.R. § 51.165(a)(1)(iii)).[6]  A "stationary

22

23  _____

24      [5]42 U.S.C. § 7602 contain "general definitions" for the CAA and § 7602(j) defines "major stationary source" as "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, [100]

25  tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)."

26      [6]40 C.F.R. 51.165(a)(1) provides, "All [SIPs] shall use the specific definitions.  Deviations from the following wording will be approved only if the state specifically demonstrates that the submitted definition is more

27  stringent, or at least as stringent, in all respects as the corresponding definition below."

28                                          10

source" is "any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant."[7] 40 C.F.R. § 51.165(a)(1)(I). "Building, structure, facility, or installation" are defined as "all of the pollutant-emitting activities which belong to the same industrial grouping,[8] are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel." 40 C.F.R. § 51.165(a)(1)(ii).

### The Clean Air Act In California

"In California, air quality standards and limitations are governed by both the CAA and state and local air quality laws." California, 215 F.3d at 1007; Beentjes, 254 F.Supp.2d at 1162. The California Health and Safety Code establishes various Air Pollution Control Districts that are empowered to adopt and enforce rules and regulations designed to achieve and maintain federal and state ambient air quality standards for the areas under their jurisdiction.[9] Cal. Health & Safety Code §§ 40001-40002; Beentjes, 254 F.Supp.2d at 1163. Most districts are created on a county-by-county basis, but some districts fall into a regional, unified, or other special district. Cal. Health & Safety Code § 40002; Beentjes, 254 F.Supp.2d at 1163 n.3. The San Joaquin Valley Unified Air Pollution Control District ("the District") is one such district and encompasses the location of the Dairy.[10] Cal. Health & Safety Code § 40600. The San Joaquin Valley area is currently classified as an "extreme" non-attainment area for 1-hour ozone and a "serious" non-attainment area for 8-hour ozone.[11] 40

---

[7]Under the general provisions of the CAA, a "stationary source" is "any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or form a nonroad engine or nonroad vehicle as defined in section 7550 of this title." 42 U.S.C. § 7602(z).

[8]"Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same Major Group (i.e., which have the same two-digit code) as described in the Standard Industrial Classification Manual . . . ." 40 C.F.R. § 51.165(a)(1)(ii).

[9]The California agency charged with coordinating efforts to reach and maintain ambient air quality standards, and to conduct research into causes of and solutions to air pollution, is the California State Air Resources Board. Cal. Health & Safety Code § 39003; Beentjes, 254 F.Supp.2d at 1163 n.4.

[10]The San Joaquin Valley Unified Air Pollution Control District contains Fresno, Kern, Kings, Madera, Merced, San Joaquin, Stanislaus, and Tulare Counties. Cal. Health & Safety Code § 40600(a).

[11]"Major stationary source" for ozone within a "serious" non-attainment area are sources that have the potential to emit 50 tons per year of VOC. 42 U.S.C. § 7511a(c).

C.F.R. § 81.305.

The EPA has approved District Rules 2010 and 2201 as part of California's/the District's SIP. See 69 Fed. Reg. 27837 (May 17, 2004) (approving amendments to Rule 2201);[12] 64 Fed.Reg 39920 (July 23, 1999) (approving, *inter alia*, Rule 2010). Rules 2010 and 2201 establishes definitions and permit requirements. See District Rules 2010, 2201.[13] The purpose of Rule 2010 is "to require any person constructing, altering, replacing, or operating any source operation which emits, may emit, or may reduce emissions to obtain an Authority to Construct or a Permit to Operate." District Rule 2010 § 1.0. An "Authority to Construct" permit is required for, "Any person building, altering, or replacing any operation, article, machine, equipment, or other contrivance, the use of which may cause the issuance of air contaminants or the use of which may eliminate or reduce or control the issuance of air contaminants, shall first obtain authorization for such construction . . . ." District Rule 2010 § 3.0.

Rule 2201 specifically deals with "New and Modified Stationary Source Review." The purpose of Rule 2201 is, *inter alia*, to provide for the "review of new and modified stationary sources of air pollution and to provide mechanisms including emissions trade-offs by which Authority to Construct such sources may be granted." District Rule 2201 § 1.1. Rule 2201 applies to "all new stationary sources . . . which are subject to the District permit requirements and after construction emit or may emit one or more affected pollutant." District Rule 2201 § 2.0. Rule 2201 also contain definitions for, *inter alia*, "stationary source" and "building, structure, facility, or installation" that are substantially similar to federal definitions. Cf. 40 C.F.R. § 51.165(a)(1) with District Rule 2201 § 3.36. A "stationary source" is "any building, structure, facility or installation which emits or may emit any affected pollutant directly or as a fugitive emission." District Rule 2201 § 3.36. "Building, structure, facility or installation includes all pollutant emitting activities

---

[12]This version of Rule 2201 was adopted by the District and forwarded to the EPA for approval in December 2002. See 68 Fed.Reg. 7321 (February 13, 2003).

[13]Unless otherwise noted, any reference to "District Rules" refer to the rules that have been both promulgated by San Joaquin Valley Unified Air Pollution Control District and approved by the EPA.

including emissions units which: are under the same or common ownership or operation, or which are owned or operated by entities which are under common control; and belong to the same two-digit standard industrial code . . .; and are located on one or more contiguous or adjacent properties."   Id.

## 1.    INSUFFICIENT ALLEGATIONS REGARDING EMISSIONS

### *Schakel's Argument*

Schakel argues that AIR makes conclusory allegations that lack an adequate basis for support. Schakel argues that AIR simply concludes that the Dairy is a stationary source under 42 U.S.C. § 7602(z). Specifically, § 7602(z) defines stationary sources to mean generally any source of an air pollutant except those emissions resulting directly from [various internal combustion engines]. However, the references to the dairy in the FAC do not appear to relate to emissions or sources of air pollution at all. Schakel argues that paragraphs 43 and 44 reference the Dairy as something consisting of barns and lagoons, but there are no allegations in the FAC that these facilities could possibly emit anything at all, let alone pollutants. The only allegations relating to emissions are found in paragraphs 55-63 and those allegations show that the emissions come from the cows or an internal combustion engine, not from the buildings. There are no allegations that the dairy has cows and there are no allegations that any of the defendants own or operate anything that emits pollutants of any kind, let alone pollutants above a certain permitting threshold. "Plaintiff must plead in its FAC that emissions from the cows and the manure take place in the building, structure, facility or installation and somehow connect the ownership or the operation of that to the defendants." Defendant's Reply at 5:15-19. Further, the facts pled in the FAC deal with future operation or performance; if emissions have not yet taken place, no violation is pled.

### *Discussion*

First, Schakel argues that the Dairy is not a stationary source under 42 U.S.C. § 7602(z) because it allegedly consists of barns and lagoons, but the only allegations regarding emissions show that emissions will come from cows/manure and a diesel engine and not from the buildings/barns

themselves.  Schakel's argument is not persuasive.  A "stationary source " for purposes of NSR permits is "any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant."  40 C.F.R. § 51.165(a)(1)(I); cf. 42 U.S.C. § 7602(z).  The Dairy facility is alleged to consist of eight freestall barns, four solid manure separation lagoons, two liquid manure separation lagoons, open corrals with flushed alleys, a milking barn, and feed storage facilities.  FAC at ¶ 44.  The Dairy components's characteristics are then described in more detail, including the dimensions of the manure lagoons.  Id. at ¶¶ 51-56.  AIR expressly alleges that, "These components comprise the dairy facility and are collectively a stationary source within the meaning of the Clean Air Act and District Rule 2201."  Id. at ¶ 44.  The complaint further alleges that the Dairy is designed to contain 5,832 milk cows and 5,058 support cows.  FAC at ¶ 48.  The complaint then alleges that the Diary facility as a whole and its particular components emit or will emit VOCs and that the Dairy is a "major stationary source because its potential to emit VOC and NO exceeds 10 tons per year."  Id. at ¶¶ 5, 60-62, 67; see also FAC at ¶¶ 65, 75-77.  Identifying how the Dairy facility produces VOCs does not change the factual allegation that the Dairy facility and its components emit VOCs and is a stationary source.[14]  The complaint's allegations are sufficient for purposes of a motion to dismiss to establish that the Dairy is a stationary source.  See Idaho Conservation League v. Boer, 362 F.Supp.2d 1211, 1214-15 (D. Idaho 2004) (holding that a dairy was sufficiently alleged to be a stationary source); see also Weiler v. Chatham Forest Products, Inc., 392 F.3d 532, 536 (2d Cir. 2004) (noting that allegations, that a proposed factory will be a major emitting facility within the meaning of the CAA and that defendant had not obtained permits, were required to be accepted as true).

---

[14]In fact, when the EPA partially disapproved California's SIP regarding Title V (42 U.S.C. § 7661 et. seq.) permits, a similar argument was rejected.  A commenter argued that Concentrated Animal Feeding Operations (CAFOs) were indirect sources of emissions because CAFOs emit nothing, rather the animals that are in the barns and other structures create organic emissions.  67 Fed.Reg. 63551, 63556 (October 15, 2002).  The EPA disagreed and responded that CAFOs are stationary sources and not indirect sources of emissions.  Id.  The EPA stated that CAFOs "plainly fit the definition of stationary source under [42 U.S.C. § 7602(z)] and the Title V regulations."  Id.  The EPA further stated, "EPA disagrees with the commenter's assertion that 'a CAFO itself emits nothing.'  CAFOs directly emit a variety of air pollutants from waste storage lagoons, barns, and other buildings, structures, and facilities where animals are confined."  Id.

Schakel's argument that the complaint is insufficient because it fails to allege "that emissions from the cows and the manure take place in the building, structure, facility or installation and somehow connect the ownership or the operation of that to the defendants," is not persuasive.  The complaint does allege that emissions from cows and manure take place in the components of the Dairy.  See FAC at ¶ 61 ("Enteric emissions of VOC from cows in freestall barns and the milking barn, as well as emissions from freshly excreted urine and feces, are non-fugitive emissions."); FAC at ¶ 62 ("Emissions from decomposing manure in solid separation lagoons and liquid storage lagoons, as well as solid manure composting piles, are non-fugitive emissions."); see also FAC at ¶¶ 51-53 (describing the barns and corrals's "flush system" for manure removal); FAC at ¶ 55 (describing use of manure storage lagoons).  Further, the complaint expressly alleges that Schakel owns and operates the Dairy.  FAC at ¶ 17.  As this is a Rule 12(b)(6) motion, the Court must assume that general allegations embrace the necessary, specific facts to support the claim.  Smith, 358 F.3d at 1106; Peloza, 37 F.3d at 521.  The Court is not aware how a dairy can operate without cows and without producing manure.  To the extent that an allegation of cows being present or owned is necessary, it can be assumed that bovine presence and/or ownership is included within the allegation of ownership and operation by Schakel.  See Smith, 358 F.3d at 1106; Peloza, 37 F.3d at 521.  This ground for dismissal is denied.[15]

## 2.   THE PASSAGE OF SENATE BILL 700[16]

### Schakel's Argument

Schakel argues that even if its Dairy is a major stationary source, AIR admits that California and the District could not have issued a permit to Schakel in 2003.  AIR alleges in paragraphs 37 and 38 that "agriculture equipment" was exempted from air district permitting requirements under District Rule 2020 and former California Health and Safety Code § 42310(e).  The EPA recognized

---

[15]Schakel's argument that there are no allegations of actual emissions is not persuasive.  The complaint alleges that Schakel failed to obtain, and follow the requirements for obtaining, a construction permit.  The complaint does not seek any relief on the basis of actual emissions.

[16]Hereinafter, "SB 700."

15

1    that § 42310(e) exempted major agricultural stationary sources from NSR permitting requirements.

2    See 68 Fed. Reg. 37746, 37747 (June 25, 2003). SB 700, which became effective January 1, 2004,

3    removed the agricultural exemption from § 42310(e). However, the mere removal of the exemption

4    did not require Schakel to obtain a permit as the sole effect of the removal was that agricultural

5    equipment, such as stationary engines, became subject to the existing permitting authority. SB 700

6    removed the exemption and imposed a new, more limited exemption which constrains the district's

7    permitting authority. New Health and Safety Code § 42301.16(c) provides that a local air district

8    cannot require a permit for any agricultural source from which the actual emissions are less than one

9    half of the applicable emissions threshold unless the air district makes a specific finding in a public

10   hearing. Moreover, Health and Safety Code § 40724.6 requires significant procedures and findings

11   as part of a rule making process. No such process has occurred, no rules have been adopted, and the

12   FAC does not plead such necessary facts. There are no allegations that show regulations have been

13   adopted such that a permit would be required for the Dairy. As no regulatory scheme has been

14   adopted, Schakel was not obligated to obtain a permit.

15          *Discussion*

16          Schakel's arguments are not persuasive. As AIR points out, if Schakel is correct that the only

17   effect of removing the agriculture equipment exemption of § 42310(e) was to make equipment, like

18   stationary engines, subject to permitting requirements, then agriculture sources that are not

19   reasonably characterized as "equipment" were and are subject to permitting requirements. If barns

20   and lagoons are not "equipment," then the Dairy facility was subject to permitting requirements and

21   the District had the ability to issue permits to the Dairy in 2003 notwithstanding § 42310(e).

22          However, irrespective of whether the District had the ability to issue a permit to the Dairy

23   in 2003, the exemption that arguably created the inability to issue permits (§ 42310(e)) was removed

24   from state law on January 1, 2004. Schakel did not obtain construction permits or begin construction

25   until January 6, 2004. FAC at ¶ 43. Schakel's December 2003 use permit contained the express

26   condition that, "to the extent that an air quality permit is required by [the District] (or by any other

27

28                                                    16

public entity) pursuant to SB 700 (Florez) or any other air quality law, then such permits shall be obtained by the applicant and the applicant shall comply therewith."  This condition clearly shows that Schakel's use permit required Schakel to follow permitting requirements of SB 700 and "any other air quality laws," which would include the CAA.

When the EPA issued a notice of deficiency based on the § 43210(e) agriculture equipment exemption, the EPA explained:

> Neither the [CAA] nor EPA regulations allow any exemptions from permitting for new major sources, and our regulations contain only limited exemptions for major modifications. 40 CFR 51.165(a)(1)(v)(C).
> . . . . . . . . . . . . . .
> California Health & Safety Code section 42310(e) exempts from all air permitting 'equipment used in agricultural operations in the growing of crops or the raising of fowl or animals.'  As a result, the State and districts cannot issue permits to these agricultural sources, even if they are major stationary sources under the Act. The CAA NSR . . . permitting requirements do not provide for this exemption.

68 Fed.Reg. 7327, 7328 (February 13, 2003).

After passage of SB 700, the EPA fully approved District Rule 2201.  In doing so, the EPA stated:

> To address the deficiency in Rule 2020, the District deleted the previous permit exemption for agricultural sources.  We note that the State has also removed a similar blanket exemption, thereby providing the District with authority to require air permits for agricultural sources, including federally required NSR permits.

69 Fed.Reg. 27837, 27838 (May 17, 2004).

Schakel has not directed the Court to an exemption within the CAA that would apply to the Dairy because it is an agricultural source of air pollution, and the Court is not aware of such an exemption.  Also, as the above references indicate, it is the EPA's position that the CAA does not exempt major stationary agriculture sources.  See 69 Fed.Reg. 27837, 27838 (May 17, 2004); 68 FR 37746, 37747 (June 25, 2003); 68 Fed.Reg. 7327, 7328 (February 13, 2003)).  Thus, it is unclear how agriculture sources that are also major stationary sources, as the Dairy is alleged to be, could be considered outside the CAA's NSR permitting requirements.

With respect to state law, SB 700 added § 39011.5 to the Health & Safety Code.  That section reads in pertinent part:

(a) "Agricultural source of air pollution" or "agricultural source" means a source of

17

air pollution or a group of sources used in the production of crops, or the raising of fowl or animals located on contiguous property under common ownership or control that meets any of the following criteria:

(1) Is a confined animal facility, including, but not limited to, any structure, building, installation, barn, corral, coop, feed storage area, milking parlor, or system for the collection, storage, treatment, and distribution of liquid and solid manure, if domesticated animals, including, but not limited to, cattle, calves . . . are corralled, penned, or otherwise caused to remain in restricted areas for commercial agricultural purposes and feeding is by means other than grazing.
. . . . .
(3) Is a Title V source, as that term is defined in Section 39053.5, or is a source that is otherwise subject to regulation by a district pursuant to this division or the federal Clean Air Act (42 U.S.C. Sec. 7401 et seq.).

(b)  Any district rule or regulation affecting stationary sources on agricultural operations adopted on or before January 1, 2004, is applicable to an agricultural source.

(c)  Nothing in this section limits the authority of a district to regulate a source, including, but not limited to, a stationary source that is an agricultural source, over which it otherwise has jurisdiction pursuant to this division, or pursuant to the federal Clean Air Act (42 U.S.C. Sec. 7401 et seq.) or any rules or regulations adopted pursuant to that act that were in effect on or before January 1, 2003 . . . .

Cal. Health & Safety Code § 39011.5.

The language of § 39011.5 indicates that District rules and regulations that were adopted before January 1, 2004, are applicable to agricultural sources of air pollution. Cal. Health & Safety Code § 39011.5(b). The section also indicates that it is not intended to limit the authority of the District to regulate a stationary agriculture source to which the District has jurisdiction pursuant to the CAA or pursuant to rules adopted before January 1, 2003. Cal. Health & Safety Code § 39011.5(c). Accordingly, from the express language of the statute, § 39011.5 intended to make District rules applicable to stationary agriculture sources and did not intend to limit the authority of districts to comply with CAA requirements. See Cal. Health & Safety Code §§ 39011.5. Section 39011.5 was part of SB 700 and Schakel's use permit included a condition to obtain permits required by SB 700. Both Rule 2010 and Rule 2201 were adopted by the District prior to January 1, 2003, see 68 Fed.Reg. 7330, 7331 (February 13, 2003); 64 Fed.Reg 39920 (July 23, 1999), and would be applicable to Schakel as per § 39011.5 and the use permit. See Cal. Health & Safety Code § 39011.5(b), (c). Therefore, § 39011.5 confirmed that the District has authority to regulate agriculture

18

sources that are subject to the CAA and made the permitting requirements of Rules 2010 and Rule 2201 applicable to Schakel. The District had the authority to issue NSR construction permits before Schakel obtained his building permits and before Schakel began construction, and the FAC expressly alleges that Schakel violated Rules 2010 and 2201. See, e.g., FAC at ¶ 71.

Schakel relies on § 42301.16(c) and § 40724.6 to argue that the District cannot issue a permit to agriculture sources without first making specific findings in a public hearing and without following specific procedures. Section 40724.6 reads in relevant part:

> (b) Not later than July 1, 2006, each district that is designated as a federal nonattainment area for ozone as of January 1, 2004, shall adopt, implement, and submit for inclusion in the state implementation plan, a rule or regulation that requires the owner or operator of a large confined animal facility, as defined by the state board pursuant to subdivision (a), to obtain a permit from the district to reduce, to the extent feasible, emissions of air contaminants from the facility.

> (c) A district may require a permit for a large confined animal facility with actual emissions that are less than one-half of any applicable emissions threshold for a major source in the district for any air contaminant, including, but not limited to, fugitive emissions in a manner similar to other source categories, if prior to imposing that requirement the district makes both of the following determinations in a public hearing:

> (1) A permit is necessary to impose or enforce reductions in emissions of air pollutants that the district show cause or contribute to a violation of a state or federal ambient air quality standard.

> (2) The requirement for a source or category of sources to obtain a permit would not impose a burden on those sources that is significantly more burdensome than permits required for other similar sources of air pollution.

Cal. Health & Safety Code § 40724.6(b), (c).

Section 40724.6 further lists various requirements, considerations, and procedures for establishing the permit required by 40724.6(b). See Cal. Health & Safety Code § 40724.6(d)-(j).

Section 42301.16(c) reads:

> (c) Prior to requiring a permit for an agricultural source of air pollution with actual emissions that are less than one-half of any applicable emissions threshold for a major source in the district, for any air contaminant, but excluding fugitive dust, a district shall, in a public hearing, make all of the following findings:

> (1) The source is not subject to a permit requirement pursuant to Section 40724.6.

> (2) A permit is necessary to impose or enforce reductions of emission of air

19

pollutants that the district show cause or contribute to a violation of a state or federal ambient air quality standard.

(3) The requirement for a source or category of sources to obtain a permit would not impose a burden on those sources that is significantly more burdensome than permits required for other similar sources of air pollution.

Cal. Health & Safety Code § 42301.16(c).

Section 42301.16(c) is very similar to § 40724.6(c), except most notably, § 42301.16(c) states that it does not apply to agriculture sources who are subject to the § 40724.6 permit requirement.  Cal. Health & Safety Code § 42301.16(c).  Additionally, § 42301.16 does not contain the detailed requirements, considerations, and procedures for establishing a permit.  Cf. Cal. Health & Safety Code § 40724.6 with Cal. Health & Safety Code § 42301.16.

Schakel does not adequately explain how these sections apply to this case.  The permit that Schakel allegedly failed to obtain was an NSR construction permit, not "a permit from the district to reduce, to the extent feasible, emissions of air contaminants."  See Cal. Health & Safety Code § 40724.6(c); FAC at ¶¶ 68, 77; cf. New York v. Niagra Mohawk Power Corp., 263 F.Supp.2d 650, 656 (W.D. N.Y. 2003) (noting the distinction between operating permits and construction permits under the CAA).  Also, § 42301.16(c), which is expressly relied upon by Schakel, as well as § 40724.6(c), allow the District to require a permit for agriculture sources with "actual emissions" of less than half of the threshold quantity of a pollutant only after certain findings are made in a public hearing.  See Cal. Health & Safety Code §§ 40724.6(c), 42301.16(c).  The complaint alleges that the Dairy emits VOC and NO, see FAC at ¶ 5, but the allegations concerning quantities of emissions are in terms of "potential to emit," not "actual emissions."  See FAC at ¶¶ 67, 78-83.  The complaint alleges that a construction permit was required because the Dairy facility has the potential to emit in excess of 25 tons per year and 2 pounds per day of VOC.  See FAC at ¶¶ 67, 68, 72, 77.  Moreover, the quantities of potential emissions are alleged to be the threshold quantities

themselves.[17]  There are no allegations that support an inference that the Dairy "actually emits" less than one-half of the threshold quantities.

Additionally, as AIR points out, both § 40724.6 and § 42301.16 contain provisions that address federal requirements.  Section 42301.16(a) reads:

> (a) In addition to complying with the requirements of this chapter, a permit system established by a district pursuant to Section 42300 shall ensure that any agricultural source that is required to obtain a permit pursuant to Title I (42 U.S.C. Sec. 7401 et seq.) or Title V (42 U.S.C. Sec. 7661 et seq.) of the federal Clean Air Act is required by district regulation to obtain a permit in a manner that is consistent with the federal requirements.

Cal. Health & Safety Code § 42301.16(a).

Sections 40724.6(f) and (j) read:

> (f) Nothing in this section shall delay or otherwise affect any action taken by a district to reduce emissions of air contaminants from agricultural sources, or any other requirements imposed on a district or a source of air pollution pursuant to the federal Clean Air Act (42 U.S.C. Sec. 7401 et seq.).

> (j) Nothing in this section limits the authority of a district to regulate a source, including, but not limited to, a stationary source that is an agricultural source over which it otherwise has jurisdiction pursuant to this division or the federal Clean Air Act (42 U.S.C. Sec. 7401 et seq.) or any rules or regulations adopted pursuant to that act. Nothing in this section shall delay or otherwise affect any action taken by a district to reduce emissions of air contaminants from agricultural sources, or any other requirements imposed upon a district or a source of air pollution pursuant to the federal Clean Air Act. This section may not be interpreted to delay or otherwise affect adoption, implementation, or enforcement of any measure that was adopted, or included in a rulemaking calendar or air quality implementation plan that was adopted, by the district prior to January 1, 2004.

Cal. Health & Safety Code § 40724.6(f), (j).

These provisions indicate that the permit requirements in § 42301.16(c) and § 40724.6 are not intended to conflict with or delay requirements imposed upon the District by the CAA.  The EPA has expressed the view that major stationary agriculture sources, as the Dairy is alleged to be, are subject to NSR permit requirements and Schakel has not shown this conclusion to be incorrect.  See 69 Fed.Reg. 27837, 27838 (May 17, 2004); 68 FR 37746, 37747 (June 25, 2003); 68 Fed.Reg. 7327,

---

[17]In fact, for purposes of 42 U.S.C. § 7511a(e), for extreme nonattainment zones, a source is a major stationary source, and thus required to follow NSR requirements, if it has the potential to emit 10 tons of VOC per year.

7328 (February 13, 2003).   To adopt Schakel's position that the District cannot issue NSR construction permits to new agricultural major stationary sources like the Dairy would create a conflict with both the requirements of the CAA and § 42301.16(a) and §§ 40724.6(f), (j).

Because there does not appear to be an exemption in the CAA for agricultural sources such as the Dairy, because Schakel has failed to adequately explain how § 42301.16(c) and § 40724.6 apply to this case, and because Schakel does not adequately address the effect of § 39011.5 on this case, this ground for dismissal is denied.

### 3.   VESTED RIGHT TO BUILD THE DAIRY UNDER THE USE PERMIT

*Schakel's Argument*

Schakel argues that California law is clear that once the last discretionary approval is granted for a project, even if there are other ministerial permits to obtain in the future, the project is vested and no additional requirements can be placed on a project.   A building permit is no longer an indispensable condition of a vested right if preliminary public permits are sufficiently definitive and manifest all final discretionary approvals required for completion of specific buildings.   See Raley v. California Tahoe Regional Planning Agency, 68 Cal.App.3d 965 (1977); Oceanic California, Inc. v. North Central Regional Com., 63 Cal.App.3d 57, 71 (1976); Aries Dev. Co. v. California Coastal Zone, 48 Cal.App.3d 534, 544 (1975).   The FAC admits that Schakel obtained a special use permit and recorded acceptance of the permit in December 2003, prior to January 1, 2004, the effective date of SB 700.   The use permit was the last discretionary approval.   Thus, Schakel had a vested right to build and operate the dairy in December 2003, irrespective of SB 700.

*Discussion*

Assuming that California's vested rights doctrine applies in this case and does not run afoul of the Supremacy Clause,[18] Schakel's argument is not persuasive.   Under California's vested rights

---

[18]In opposition, AIR argues that the vested rights doctrine cannot "trump" the CAA without violating the supremacy clause, the vested rights doctrine is not applicable because that doctrine is applicable to state zoning laws, and Schakel cannot show good faith reliance on the use permit.

22

doctrine:

> [I]f a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. Once a landowner has secured a vested right the government may not, by virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he relied. . . . The vested rights doctrine protects the developer's right not only to construct, but also to use the premises as authorized by the permit.

Russ Bldg. Partnership v. City and County of San Francisco, 44 Cal. 3d 839, 845-46 (1988) (citations omitted); see also Avco Community Developers, Inc. v. Coastal Regional Com., 17 Cal.3d 785, 791 (1976). "Courts have yet to extend the vested rights . . . theory to instances were a developer lacks a building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted. . . . California courts apply this rule most strictly." Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach, 86 Cal.App.4th 534, 553 (2001) (quoting Toigo v. Town of Ross, 70 Cal.App.4th 309, 322 (1998)).

In *Russ Bldg. Partnership*, plaintiffs obtained a building permit from the City and County of San Francisco, began construction, and incurred material expense.  Russ Bldg. Partnership, 44 Cal.3d at 846.  The building permit contained a condition that developers were to participate "in a downtown assessment district, or similar fair and appropriate mechanism, to provide funds for maintaining and augmenting transportation service."  Id. at 843.  Prior to completion and after plaintiffs began construction, the City and County passed a Transit Impact Development Fee which required developers of downtown buildings containing new office space to pay a fee, not to exceed $5 per square foot of new office space, as a condition of issuance of a certificate of completion and occupancy.  Id. at 844.  Plaintiffs filed suit and argued, *inter alia*, that being subject to the fee violated the vested right under the building permit.  Id. at 845.  The California Supreme Court framed the issue as follows:

> Plaintiffs had been issued building permits, had begun construction, and had made a substantial financial commitment to their projects almost two years before the City enacted the TIDF ordinance. Thus, they had a vested right to complete the buildings and occupy them under the conditions contained in the permits. It is clear that if the

23

> resolutions authorizing plaintiffs' building permits did not contain the transit mitigation condition, application of the later-enacted TIDF ordinance to plaintiffs would impair their vested rights and violate due process. (See post, pp. 853-854.) However, if the TIDF falls among the funding mechanisms contemplated by the resolutions, then application of the ordinance to plaintiffs is proper. Our task is to decide if the transit mitigation condition included the eventuality of the TIDF ordinance.

Id. at 846.  The Court concluded that:

> while a mechanism which applies to both existing and new development certainly would be within the scope of the condition, nothing in the language compels a conclusion that the condition was intended to be so limited, or to exclude a mechanism such as the TIDF which applies only to new properties. Moreover, we find that the TIDF falls well within the range of funding mechanisms contemplated by the words "similar," "fair" and "appropriate."

Id. at 847.  Because the fee program, i.e. the TIDF, was contemplated within the conditions of the building permit, plaintiffs were subject to the TIDF.  Id. at 854.  "To exempt [plaintiffs] from the TIDF [ordinance] would give them greater rights than those granted by their permits."  Id.

Here, first, it is unclear that the use permit is the last discretionary permit, or more accurately, the functional equivalent of a building permit.  See Hermosa Beach, 86 Cal.App.4th at 552-53.  The use permit required Schakel, inter alia, to submit "completed applications, technical reports, and any required filing fee to the [regional water board] prior to the issuance of any building permits . . . Failure to submit the material in th required time will result in . . . a recommendation to the Planning Commission for initiating the process of revocation of the [use permit]."  Special Use Permit No. PSP 98-061 at ¶ 3; cf. Hermosa Beach, 86 Cal.App.4th at 552-53 (holding that vested rights doctrine did not apply where all discretionary permits had not been obtained and noting that developer still needed to submit additional studies and analysis prior to issuance of building permit).  The use permit was accepted by Schakel on December 18, 2003, but the complaint alleges that Schakel obtained a building permit on January 6, 2004, and a building permit for the lagoons on November 1, 2004, by which both times SB 700 had gone into effect.  FAC at ¶ 43.  The condition in the use permit with respect to the water board, the condition that Schakel was to obtain any necessary air permit from the District (as discussed previously and also below), and the later acquisition by Schakel of building permits suggest that the use permit was not the final discretionary permit or the

1   functional equivalent of a building permit. See Hermosa Beach, 86 Cal.App.4th at 552-53.

2          Furthermore, as discussed above, Schakel's use permit contained the condition that, "to the

3   extent that an air quality permit is required by [the District] (or by any other public entity) pursuant

4   to SB 700 (Florez) or any other air quality law, then such permits shall be obtained by the applicant

5   and the applicant shall comply therewith." The use permit was issued to Schakel on December 17,

6   2003, prior to the effective date of SB 700. However, this condition clearly shows that Schakel's

7   use permit required Schakel to follow permitting requirements of SB 700 and "air quality laws,"

8   which would include the CAA. Among other things, SB 700 eliminated the agriculture equipment

9   exemption under § 42310(e) and added § 39011.5 to the Heatlh and Safety Code, which states that

10  District rules adopted before January 1, 2004, are applicable to stationary sources and that the section

11  does not limit a district's ability to follow CAA requirements. Cal. Health & Safety Code §

12  39011.5(b), (c). Any vested rights that Schakel may have that originate from the use permit are

13  limited by the terms and conditions of the use permit itself. Russ Bld. Partnership, 44 Cal.3d at 853-

14  54. The use permit requires compliance with both the CAA and SB 700. Although SB 700 did not

15  go into effect until 14 days after Schakel filed acceptance of the use permit/the permit's conditions,

16  the use permit evidences the intent that any permit requirements within SB 700 and the CAA apply

17  to Schakel. To exempt Schakel from the NSR permitting requirements on the basis of the use permit

18  would give Schakel "greater rights than those granted by [its use] permit." Russ Bldg. Partnership,

19  44 Cal.3d at 854. Additionally, given the condition of the use permit, Schakel has not adequately

20  explained at this point how it can claim "good faith reliance" on the use permit to exclude it from

21  District and CAA NSR permitting requirements. Id. at 846; Avco, 17 Cal.3d at 791. This ground

22  for dismissal is denied.

23

24                                    **CONCLUSION**

25          Defendant moves to dismiss AIR's complaint on three grounds: there are insufficient

26  allegations to show that the Dairy is a stationary source, there are insufficient allegations to show that

27

28                                          25

the Dairy is subject to permitting requirements by the District, and Schakel had a vested right to construct the Dairy without obtaining air quality permits.

With respect to allegations that the Dairy is a stationary source, the FAC describes the components of the Dairy, states that the components constitute the Dairy facility, alleges that the Dairy is a stationary source, and alleges that the Dairy and its components may emit VOC at a rate of at least 25 tons per year and 2 pounds per day.  The FAC further alleges that Schakel owns and operates the Dairy.  These allegations are sufficient to establish that the Dairy is a stationary source for purposes of Rule 12(b)(6).

With respect to permitting requirements, the EPA does not recognize an exemption for agriculture sources for purposes of NSR permits and Schakel has not identified such an exemption within the CAA.  With respect to state requirements and District authority, assuming that the agriculture exemption of § 42310(e) would have prevented the District from issuing Schakel a construction permit, that exemption was repealed prior to Schakel obtaining construction permits and beginning construction.  Schakel's use permit, accepted by Schakel in December 2003, contained a condition that Schakel obtain any permits required by SB 700 and "other air quality laws," e.g. the CAA.  SB 700 became effective on January 1, 2004, and added new sections to the Health and Safety Code.  Section 39011.5 was one such section that was added.  That section indicates that District rules and regulations that were adopted before January 1, 2004, are applicable to stationary agricultural sources and that the section is not intended to limit the authority of the District to regulate a stationary agriculture source to which the District has jurisdiction pursuant to the CAA or rules adopted before January 1, 2003.  Cal. Health & Safety Code § 39011.5(b), (c).  The elimination of § 42310(e)'s agriculture equipment exemption and the addition of § 39011.5 show that the District had the authority to issue permits at least as of January 1, 2004.  Further, Schakel has not shown how § 40724.6 or § 42301.16(c)'s permit requirements are applicable in this case as Schakel is alleged to have not obtained an NSR construction permit and there are no allegations of actual emissions that are one half the applicable threshold.

1    Finally, with respect to vested rights under the use permit, assuming that the vested rights

2    doctrine applies and is not affected by the Supremacy Clause, Schakel has not shown how that

3    doctrine excuses it from NSR requirements.  First, since building permits were obtained after the use

4    permit was accepted and there were conditions with respect to the water board and air quality permits

5    in the use permit, it is not clear that the use permit was the final discretionary permit required or the

6    functional equivalent of a building permit.  Second, the use permit has the express condition that

7    Schakel obtain any permit required by SB 700 and "any other air quality law," e.g. the CAA.

8    Although SB 700 had not gone into effect at the time Schakel accepted the use permit, the condition

9    shows that the permit intended SB 700 and the CAA to be applicable to Schakel.  To excuse NSR

10   permit requirements would grant Schakel greater rights than those contained in the permit.  Finally,

11   given the condition that Schakel obtain permits required by SB 700 and the CAA, Schakel has not

12   adequately shown how it could rely on the use permit to excuse obtaining NSR permits.

13

14        Accordingly, IT IS HEREBY ORDERED that:

15   1.     Defendants's Motion to Dismiss is DENIED; and

16   2.     Defendant shall file an answer to Plaintiff's First Amended Complaint within

17          fourteen (14) days from service of this order.

18   IT IS SO ORDERED.

19   **Dated:    December 2, 2005           _____/s/ Anthony W. Ishii_____**
     0m8i78                                UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28                                        27