1

2

3                    UNITED STATES DISTRICT COURT

4                    EASTERN DISTRICT OF CALIFORNIA

5

6   ASSOCIATION OF IRRITATED          1:05-CV-00707 OWW SMS
    RESIDENTS, an Unincorporated
7   Association
                                      MEMORANDUM DECISION AND ORDER
8              Plaintiff,             DENYING DEFENDANTS' MOTION TO
                                      DISMISS (Doc. 160)
9       v.

10  FRED SCHAKEL DAIRY, a
    California Proprietorship,
11  FRED SCHAKEL, owner and
    operator, SCHAKEL FAMILY
12  PARTNERSHIP, a California
    Limited Partnership, owner and
13  operator, AG RESOURCES III, a
    California Limited Liability
14  Company, owner and, SOUTH
    LAKES DAIRY, a California
15  General Partnership, owner and
    operator,
16
               Defendants.
17

18

19                    1.   __INTRODUCTION__

20       Defendants move to dismiss Plaintiff's Association of

21  Irritated Residents ("AIR") third cause of action alleging

22  Defendants violated the Clean Air Act ("CAA") section

23  112(g)(2)(B), 42 U.S.C. § 7412(g)(2)(B), because they constructed

24  a major source of Hazardous Air Pollutants ("HAP") and failed to

25  obtain a Maximum Available Control Technology ("MACT")

26  determination for methanol emissions prior to initiating

27  construction of the Fred Schakel Dairy also known as the South

28  Lakes Dairy (the "Dairy"). (Doc. 160, Motion to Dismiss, Filed

                                   1

August 20, 2007)  AIR opposes the motion. (Doc. 212, Opposition, Filed December 28, 2007)  This matter was heard on January 28, 2008.  Supplemental briefing was permitted by both parties after the January 28, 2008 hearing to further address mootness and the recently issued an Authority to Construct ("ATC") permit by the San Joaquin Valley Air Pollution Control District ("the District") which found the Dairy did not emit more than ten tons per year of methanol and therefore no MACT determination was necessary under CAA § 112(g)(2)(B).

## 2.  PROCEDURAL BACKGROUND

AIR filed its initial complaint on June 1, 2005. (Doc. 1) AIR filed its Fourth Amended Complaint on July 3, 2007 to add the third cause of action for violation of CAA section 112(g)(2)(B). (Doc. 153, Complaint)  On August 20, 2007, Defendants filed a Motion to Dismiss. (Doc. 160, Motion to Dismiss)  AIR opposed the Motion to Dismiss on December 28, 2007. (Doc. 212, Opposition) On January 7, 2008 Defendants filed their reply to Plaintiff's Opposition. (Doc. 218, Reply)  Plaintiff's Supplemental Brief in Opposition to Defendant's Motion to Dismiss was filed on February 4, 2008. (Doc. 253, Suppl. Opposition)  Defendants filed their Reply to Plaintiff's Suppl. Opposition on February 7, 2008. (Doc. 254, Suppl. Reply)  On March 21, 2008, Defendants filed a notice of supplemental authority in support of their Motion to Dismiss. (Doc. 272, Suppl. Authority)

## 3.  FACTUAL BACKGROUND

The background facts for this entire suit are set forth in prior rulings, therefore only pertinent facts are repeated and amplified upon for the purposes of evaluating Defendants' Motion

2

to Dismiss Plaintiff's third cause of action. *See* Doc. 36, Order and Doc. 117, Order.

### A. The Clean Air Act

The general purpose of the CAA is to enhance the quality of the nation's air quality resources for the benefit of public health.  The CAA requires the United States Environmental Protection Agency ("EPA") to set National Ambient Air Quality Standards ("NAAQS") for certain pollutants including Ozone.  The CAA requires states to designate areas within its boundaries as "attainment" areas if the air quality meets the NAAQS for a particular criteria pollutant.  Areas where the air quality does not meet the NAAQS for a particular criteria pollutant are designated as "non attainment" areas for that pollutant.  Ozone non attainment areas are divided under the CAA as "marginal," "moderate," "serious," "severe," and "extreme" based on the severity of the ozone problem.  The San Joaquin Valley Air Basin has been designated as a "serious" non attainment area for the eight-hour ozone[1] NAAQS and an "extreme" non attainment area for the one-hour ozone NAAQS.

Non attainment areas are required to adopt state implementation plans ("SIP") to achieve the NAAQS by the applicable attainment date.  The CAA requires that a SIP shall "require permits for the construction and operation of new or modified major stationary sources anywhere in the non attainment area."  This preconstruction permit is a New Source Review

---

[1] The eight-hour ozone standard is .08 parts per million measured over the daily maximum eight-hour average.

("NSR") permit.

As part of its obligations under the SIP program, the District adopted Rule 2010 to implement the ATC permitting program (permits before construction begins) and the Permit to Operate permitting program ("PTO") (permits after construction) and Rule 2201 to implement the New Source Review ("NSR") permitting program.  On January 1, 2004 California Senate Bill 700 removed a previously existing agricultural exemption for issuing NSR permits to agricultural resources.  After 2004, agricultural sources were required to obtain NSR permits prior to construction of a stationary source facility.  Rule 2201 requires a new or modified stationary source of air pollution or emissions unit to install Best Available Control Technology ("BACT") when the potential to emit volatile organic compounds ("VOC") exceed 2 pounds per day.  The rule also requires that new or modified stationary sources purchase "offsets" or "emissions reduction credits" for VOC when the source's potential to emit exceeds 10 tons per year.

Section 112 of the CAA requires EPA to set emission standards for any HAP. *See* 42 U.S.C. § 7412(d).  In 1990, Congress amended section 112 to establish a statutory list of HAPs. *See* 42 U.S.C. § 7412(b)(1).  Methanol is included on that list. *Id.*  EPA must promulgate technology-based National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for categories of sources that emit any HAP. 42 U.S.C. § 7412(d). "These emission standards are to be based not on an assessment of the risks posed by HAPs, but instead on the maximum achievable control technology (MACT) for sources in each category." *Sierra*

**4**

1  *Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004).  EPA has not yet
2  promulgated any NESHAPs for dairies or other animal feeding
3  operations, therefore the EPA or the permitting authority, the
4  District, must make a final and effective case-by-case
5  determination that the emissions from a constructed major source
6  will be controlled to a level no less than MACT.  The District
7  has implemented Rule 2550, Federally Mandated Preconstruction
8  Review for Major Sources of Air Toxics, "to provide an
9  administrative mechanism for implementing the preconstruction
10  review requirements of 40 C.F.R. part 63.40 through 63.44 [CAA
11  Section 112(g) Regulations for Major Sources] at major air toxic
12  sources." San Joaquin Valley Air Pollution Control District,
13  Regulation II - Permits, Rule 2550, Federally Mandated
14  Preconstruction for Major Sources of Air Toxics (Adopted June 18,
15  1998).

16      **B.    Permitting and Construction of the Schakel Dairy**

17      On December 17, 2003, Defendants obtained approval for a
18  special use permit from the Tulare County Planning Commission in
19  order to construct the Dairy.  On December 18, 2003, Defendants
20  recorded acceptance of the conditions of approval and agreed to
21  comply with the conditions within the use permit.  On January 6,
22  2004, Defendants obtained building permits for the Dairy and
23  obtained a building permit for a manure separator pit on November
24  1, 2004.  Defendants allegedly began actual construction on the
25  Dairy on or after January 6, 2004, but prior to construction did
26  not obtain an ATC permit pursuant to CAA 42 U.S.C. 7604(a)(1).
27  Nonetheless, Defendants constructed the Dairy to achieve the
28  maximum operational capacity prescribed by the special use

5

permit.   On July 16, 2007, the District proposed to grant the ATC permit. (Doc. 218, Declaration of Melissa Foster ("Foster Decl."), Exhibit B1)   The District ATC Application Review, stated that it proposed to find the Dairy emitted less than 10 tons per year of methanol and was "not a major air toxics source" and therefore did not necessitate a MACT determination. (Doc. 218, Foster Decl., Exhibit B2, p. 51)   On September 17, 2007, AIR submitted comments to the District on the proposed permit stating that the Dairy was a major source of methanol and thus subject to a MACT determination under Section 112. (Doc. 218, Foster Decl., Exhibit A, p. 4 and 9)   The District, on December 4, 2007 approved the Dairy's ATC permit and made a finding that the Dairy was not a major source of HAP under CAA Section 112, applying its emission factors for dairies, and therefore the Dairy did not have to comply with any MACT requirements. (Doc. 218, Foster Decl., Exhibit A, p. 9)

C.   Dairy Cows and Methanol

The Dairy emits methanol from cows' enteric emissions, freshly excreted manure, and decomposing feed stored at the Dairy.   The human health risks from methanol exposure include a decrease in gestation time, an increase in the number of required Caesarian-section births, and, in prenatally exposed children, instances of a severe wasting syndrome, concentration-related delay in sensorimotor development and lower performance on an infant intelligence test. *See also* American Forest and Paper Association v. EPA, 294 F.3d 113, 118-119 (D.C. Cir. 2002) (denying petition for review of EPA decision that denied industry petition to delist methanol, citing 66 Fed. Reg. 21929, 21932-

21935).

The Dairy is designed to house a maximum 5,832 Holstein milk cows plus 5,058 support stock, as limited by the special use permit.  A 1,000 pound cow produces the waste of approximately 20 people.  The Dairy produces the equivalent waste of a city of approximately 275,000 people.

Defendants have constructed, or are in the process of constructing, eight freestall barns, four manure solid separation lagoons, two liquid manure storage lagoons, corrals with flushed alleys for support stock, a milking barn, and feed storage facilities.  These components comprise the Dairy facility and are collectively a stationary source within the meaning of the CAA and District Rule 2201.  These components also constitute the Dairy facility.  The Dairy also has at least one diesel internal combustion engine that is greater than 50 horsepower.  The Dairy facility will occupy 256 acres.  Fred Schakel and the Schakel Family Partnership own and operate the Dairy.

Each of the eight freestall barns is 750 feet long and 102.5 feet wide and is equipped with a system that uses wastewater from the liquid manure storage lagoons to flush the manure from the freestall barns.  The barns' flush system captures 80% or more of the 5,832 milk cows's urine and feces and flushes the waste to the liquid manure storage lagoons.  The milk cows will be milked three times per day in a centrally located milking barn, which is equipped with a flush system similar to the freestall barns except that fresh water is used to flush the cows's waste to the liquid manure storage lagoon.  The support stock will be confined in open, dirt lined corrals that are equipped with a flush system

on concrete lined feed alleys.  The corrals's flush system captures 60% or more of the 5,058 support stock's urine and feces and flushes the waste to the liquid manure storage lagoons.

The Dairy has four solid separation lagoons where suspended solids in the liquified waste settle out of the waste stream. Each solid separation lagoon is 1,200 feet long and approximately 50 feet wide.  The Dairy has two liquid manure storage lagoons, one measuring 400 feet wide by 1,000 feet long and the other measuring 400 feet wide by 650 feet long.  The total volume of liquified waste storage is 10,024,848 cubic feet.  Liquified manure from the freestall barns and flushed alleys will enter the solid separation lagoons, from which a portion of the manure solids will be removed and composted, and the two liquid manure storage lagoons will store the remaining liquified waste.  The liquid manure storage lagoons will also contain manure contaminated wastewater and stormwater.  The Dairy will use the liquified waste from the liquid manure storage lagoons as fertilizer for crops (alfalfa, wheat, and corn silage) grown on 1,550 acres.  Feed will be stored at the southeast corner of the Dairy facility, and solid manure will be shipped off-site for use as fertilizer at nearby farming operations.

D.   Citizen Enforcement Action

On June 1, 2006, AIR filed its complaint under CAA citizen suit provisions 42 U.S.C. § 7604(a)(3)[2] and 42 U.S.C. §

---

[2] **42 U.S.C. § 7604(a)(3) provides: "Any person may commence a civil action on his own behalf against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under... part D of title I**

7604(a)(1).[3]  On April 19, 2007, AIR sent a 60-day notice letter for violations of section 112 of the CAA.  AIR alleges in its third claim that Defendants have violated section 112(g)(2)(B) of the CAA and 40 C.F.R. § 63.42(c) by constructing a major source of methanol, a HAP, without a Maximum Achievable Control Technology (MACT) determination from the District.  AIR seeks declaratory and injunctive relief, the imposition of civil fines, and attorney's fees.

### 4.   REQUEST FOR JUDICIAL NOTICE

Defendants request judicial notice of Authority to Construct (ATC) Permit issued to the Dairy by the District on December 3, 2007. (Doc. 218, Defendants' Request for Judicial Notice, Exhibit A to Foster Decl.)  Defendants request judicial notice of San Joaquin Valley Air Pollution Control District Application Review for the Dairy (July 16, 2007). (Doc. 218, Defendants' Request for Judicial Notice, Exhibit B to Foster Decl.)  The Permit and Application for Review are proper for judicial notice as they are self-authenticating documents pursuant to Federal Rules of Evidence 902(5) - on their face they contain the letterhead of the San Joaquin Valley Air Pollution Control District (the District) and the subject line of the ATC Permit materials state

_____

(relating to non attainment)."

[3] **42 U.S.C. § 7604(a)(1) provides: "Any person may commence a civil action on his own behalf against any person who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation..."**

"Notice of Final Action - Authority to Construct Project Number: S-1055047."  The documents therefore suggest they are official publications issued by a public agency.  In doing so this does not turn this Motion to Dismiss into a motion for summary judgment.

> On a motion to dismiss, however, a court may take judicial notice of facts outside the pleadings. Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd., 245 F.2d 67, 70 (9th Cir.1956); 5 C. Wright & A. Miller, Federal Practice & Procedure, § 1363 at 659-60 (1969). Moreover, a court may take judicial notice of "records and reports of administrative bodies." Interstate Natural Gas Co. v. Southern California Gas Co., 209 F.2d 380, 385 (9th Cir.1953).  Therefore, on a motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment.

*Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 (1991).[4]

---

[4] Plaintiff AIR seeks to have the court take judicial notice of an expert declaration and its accompanying exhibits which include a draft EPA scientific article and scientific articles to establish the assertion that Defendants were aware that methanol emissions existed from dairy cattle. (Doc. 214, Parker Decl. and Doc. 218, Plaintiff's Request for Judicial Notice)  David P. Parker, a professor of Environmental Science and Engineering at West Texas A&M specializing in agricultural waste management, provides a declaration as an expert.  AIR requests judicial notice of an excerpt, attached as an exhibit to the Parker Decl., of an official public record produced by the U.S. Environmental Protection Agency titled "Emissions for Animal Feeding Operations" and labeled as a "Draft". (Parker Decl., Exhibit 1) AIR requests judicial notice of an excerpt of scientific journal articles published in the Journal of Agricultural Engineering Research, Transactions of the ASA, and the Journal of Dairy Science. (Parker Decl., Exhibits 2, 3, and 4)  Defendants object to Plaintiff's Request for Judicial Notice on the grounds that

Defendants request for judicial notice is GRANTED.

### 5. <u>MOTION TO DISMISS</u>

A. **Legal Standard**

Fed. R. Civ. P. 12(b)(6) provides that a motion to dismiss may be made if the plaintiff fails "to state a claim upon which relief can be granted."  However, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are disfavored and rarely granted. *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). In deciding whether to grant a motion to dismiss, the Court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); see also *Rodriguez v. Panayiotou*, 314 F.3d 979, 983

───────────────

the proffered documents do not meet requirements of Federal Rules of Evidence 201(b).  Federal Rules of Evidence 201(b) states:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Fed. Rules Evid. 201(b).  Parker's Declaration addresses disputed facts relating to the specific time Plaintiff's assert the Dairy should have known of the emissions.  The EPA Report is a draft report and the scientific articles, the basis of which is disputable.  These scientific articles, Draft EPA report and expert declaration are provided as evidence for Plaintiff's allegation in its Complaint that Defendants had knowledge of methanol emissions from the Dairy.  Such an analysis involves a weighing of evidence as the matters are in dispute and would convert the Motion to Dismiss to a summary judgment proceeding.
Plaintiff's request for judicial notice is DENIED, except as to the existence of the articles.

11

(9th Cir. 2002).  A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  "A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (citations omitted).

B.   Mootness

In their third cause of action, AIR alleges that Defendants are a "major source" of methanol and have failed to obtain a MACT determination from the EPA or District prior to construction of the Dairy in violation of section CAA 112(g)(2)(B), 42 U.S.C. § 7412(g)(2)(B) and 40 C.F.R. § 63.42(c).  AIR alleges such violations are on-going and will continue unless remedied by an order from the Court.  AIR seeks declaratory and injunctive relief, the imposition of civil fines, and attorney's fees. These allegations are sufficient if taken as true to allege a violation of the CAA section 112(g)(2)(B) under § 7604(a) of the CAA. *See* Fed. R. Civ. Pro. 8(a); 42 U.S.C. § 7604.[5]

---

[5] *See also* 42 U.S.C. § 7402(g) defining "emission standard or limitation":

1    Defendants argue that they are not in violation of CAA

2  Section 112(g)(2)(B) and could not be in violation of CAA Section

3  112(g)(2)(B) as they did not "construct a major source" of

4  methanol, a listed HAP.  The District recently determined, in

5  December 2007, in conducting its ATC permit analysis of the

6  Dairy, that the Dairy emits less than 10 tons per year of

7  methanol.  Defendants argue that as a result they are not

8  required to obtain a MACT determination from the District since

9  only "major sources" of HAP, those that emit or have the

10  potential to emit more than ten tons per year of HAP, are

11  required to do so.  Defendants argue this issue is now moot.

12    The Ninth Circuit describes the doctrine of mootness as "the

13  requirement that the controversy remain live even after the

14  plaintiff demonstrates initial standing." *Skysign Intern., Inc.*

15  *v. City and County of Honolulu,* 276 F.3d 1109, 1114 (9th Cir.

16  2002).  To establish mootness, a defendant must show that the

17  court cannot order any effective relief. *San Francisco Baykeeper,*

18  *Inc. V. Tosco Corporation, Diablo Services, Inc.*, 309 F.3d 1153,

19

20

21    ───────────────

22    **(f) "Emission standard or limitation under this
     chapter" defined**

23        **For purposes of this section, the term "emission
        standard or limitation under this chapter" means--**

24            **(3) any condition ...or any requirement under
            section 7411 or 7412 [Clean Air Act, Hazardous**

25            **Air Pollution section which includes**

26            **112(g)(2)(B), 42 U.S.C. § 7412(g)(2)(B)] of this
            title (without regard to whether such**

27            **requirement is expressed as an emission standard
            or otherwise);**

28

13

1159 (9th Cir. 2002).  Defendants claiming mootness must satisfy a "heavy burden of persuasion." *Id.*

Plaintiff's seek to enforce Clean Air Act section 112(g)(2)(B) which states:

> No person *may construct* or reconstruct *any major source of hazardous air pollutants*, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met.  Such determination shall be on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

42 U.S.C. § 7412(g)(2)(B).

Federal Regulations 40 C.F.R. § 63.41(1) defines "Construct a major source" to mean:

> To fabricate, erect, or install at any greenfield site a stationary source or group of stationary sources which is located within a contiguous area and under common control and *which emits or has the potential to emit 10 tons per year of any HAP's* or 25 tons per year of any combination of HAP,

40 C.F.R. § 63.41(1) (emphasis added).

No person may begin actual construction or reconstruction of a "major source" of HAP unless: (1) the major source is regulated by a NESHAP, and complies with such standard (in regards to methanol, EPA has not established a NESHAP); or (2) the permitting authority has made a final and effective case-by-case determination pursuant to the provisions of 40 C.F.R. § 63.43 such that emissions from the constructed or reconstructed major source will be controlled to a level no less stringent than the MACT emission limitation for new sources. 40 C.F.R. § 63.42(c); *see also* 42 U.S.C. § 7412(g)(2)(B).

Defendants argue that AIR's action, which seeks injunctive relief, is moot because Defendants have applied and received a

14

final ATC permit from the District on December 3, 2007.  The District's analysis for the ATC included an express calculation of the methanol levels and found that based on the District's emission factors developed in 2005 that the Dairy was not a major source of methanol, and no further calculations were required.

> As shown above, each individual HAP is expected to be below 10 tons per year and total HAP emissions are expected to be below 25 tons per year.  The largest individual HAP is methanol, at 5.5 tons per year (7.49 tons x 1.35 lbs-methanol/1.828 lbs-HAPs).  Therefore, this facility will not be a major air toxics source and the provisions of Rule 2550 do not apply.

(Doc. 218, Foster Decl., District Application Review for the Dairy, Exhibit B, p. 50-51).  In the District's response to comments to the ATC,[6] the District stated:

> [B]ased on the current dairy emission factors, emissions of each individual HAP from South Lakes Dairy are expected to be below 10 tons per year and total HAP emissions are expected to be below 25 tons per year.  Therefore, this facility will not be a major air toxics source and the provisions of Rule 2550 do not apply.

(Doc. 218, Authority to Construct Permit, District's Responses to Comments, Exhibit A, p. 6).  District Rule 2550 was enacted by the District to provide an administrative mechanism for implementing the preconstruction review requirements of 40 CFR part 63.40 through 63.44 at major air toxic sources. District Rule 2550, § 1.[7]

_____

[6] The District received a letter on September 19, 2007 from the attorney for the Center on Race, Poverty and Environment ("CPRE").  The District provided a summary of its responses as well as CRPE's comments.  Comments to District are received after the District issues its preliminary decision to issue an ATC permit. (Doc. 218)

[7] The provision is applicable only to "applications to construct or reconstruct a major air toxics source with Authority

15

1      Plaintiff's allegations that the Dairy is a "major source"

2  is based on a study, made public in 2006, claiming the Dairy has

3  the potential to emit ten tons per year of methanol.  Plaintiff

4  contends that Courts interpreting the CAA and the Clean Water Act

5  ("CWA") have held that Congress allows citizen suits to proceed

6  in circumstances where the agency charged with implementing the

7  statute had found no permit was required, and the citizen suit

8  alleged such a permit was required.  Here, Plaintiff contends,

9  while not a suit alleging the State agency failed to issue a

10 permit when one should be issued, this case is analogous in that

11 the District (the State Agency) found no MACT determination was

12 necessary and therefore none was undertaken, and it, alleges such

13 MACT determination is required.  This court agrees.

14      Plaintiff cites several CAA, CWA and Resource Conservation

15 and Recovery Act ("RCRA") decisions.  While no one case and no

16 court has directly addressed a challenge under § 112(g)(2)(B) of

17 the CAA, there is guidance on addressing whether a citizen suit

18 may be brought where a state agency, here, the District, has

19 determined that the Dairy is not a major source of HAP and

20 therefore, no MACT determination is required under CAA §

21 112(g)(2)(B).

22      In *Ass'n to Protect Hammersley, Eld, and Totten Inlets v.*

23 *Taylor Resources*, *Inc.*, 299 F.3d 1007 (9th Cir. 2002), a citizen

24 suit was bought under the CWA against a mussel-harvesting company

25 operating in the Puget Sound.  Plaintiffs alleged the company

26

27 ─────────────

28 to Construct issued on or after June 28, 1998." District Rule
   2550, § 2.

violated the CWA because it discharged pollutants that emitted from mussels without an NPDES permit.  The state agency in charge of issuing NPDES permits, Ecology, determined a permit was not required.  Ecology would neither accept nor process an NPDES permit application.  The Court in *Taylor* permitted the citizen suit to go forward.  "Although the EPA or an authorized state agency may be charged with enforcement of the Clean Water Act, neither the text of the Act nor its legislative history expressly grants to the EPA or such a state agency the exclusive authority to decide whether the release of a substance into the waters of the United States violates the Clean Water Act." *Id.* at 1012. The Court also noted that the CWA citizen suit provision is similar to the CAA citizen suit provision and relied on CAA cases as well as CWA cases for its determination that Ecology was not a necessary party to the citizen suit "when that agency has decided that an NPDES permit is not required." *Id.* at 1014.[8]

Plaintiff also cites *Association of Irritated Residents v. C&R Vanderham Dairy*, NO. CIVF051593 AWISMS, 2006 U.S. Dist. LEXIS 96061 at *26-33, 2006 WL 2644896, at *9 (E.D. Cal. Sep. 14, 2006) (*Vanderham II*).  In *Vanderham II*, AIR brought suit under CAA 42 U.S.C. § 7604(a)(1), alleging violation of an emission standard or limitation.  The District had determined that no ATC permit

---

[8] "Although these cases addressed circumstances in which the citizen plaintiff was seeking to enforce the terms of an existing pollution abatement plan or NPDES permit that had been approved by the relevant agency, there is no sound reason to distinguish between the cases cited above and this case. The plain language of the Clean Water Act has created opportunity for citizen suit when government agencies do not act." *Taylor*, 299 F.3d at 1014 (citation omitted).

was required.  AIR did not challenge the District's decision

regarding the permit nor had AIR sued the District.  The

challenge to AIR's suit was based on *res judicata* grounds.[9]

However, the Court held that AIR could proceed with its citizen

suit notwithstanding the District's decision that a "permit" was

not required. *Id.* at *27-28.  "The plain language of the statute

is broad enough to cover cases where a defendant has failed to

obtain a permit (for whatever reason), and cases where a

defendant is violating a term or condition of a permit." *Id.* at

*27;[10] *see also Saint John's Organic Farm v. Gem County Mosquito*

---

[9] On the issue of res judicata, the *Vanderham II* court found
that the District's 2005 letter was not res judicata, neither the
letter nor the determination was "litigation," the letter not
being final judgment.  AIR was not a party to the letter nor the
determination by the District.

[10] "Because of the similarities between the Clean Water
Act's, the Clean Air Act's, and the Resource Conservation and
Recovery Act's respective citizen suit provisions, cf. 33 U.S.C.
§ 1365 with 42 U.S.C. § 7604 with 42 U.S.C. § 6972, courts "have
relied on cases interpreting the citizen suit provisions in each
of these statutes to interpret the other's citizen suit
provision." *Vanderham II*, 2006 US DIST LEXIS 96061, at *28 (citing
*Ashoff v. City of Ukiah*, 130 F.3d 409, 413 (9th Cir. 1997)).

Under the <u>CAA citizen suit provision</u>, it states, in relevant
part,

(a) Authority to bring civil action; jurisdiction
Except as provided in subsection (b) of this section, any
person may commence a civil action on his own behalf--
(1) against any person (including (i) the United States, and
(ii) any other governmental instrumentality or agency to the
extent permitted by the Eleventh Amendment to the
Constitution) who is alleged to have violated (if there is
evidence that the alleged violation has been repeated) or to
be in violation of (A) an emission standard or limitation
under this chapter or (B) an order issued by the

*Abatement Dist.*, No. CV-04-87-S-BLW, 2007 U.S. Dist. LEXIS 63224, 2007 WL 2461990 at *2 (D. Idaho Aug. 27, 2007)("As long as a citizen complies with the statutory prerequisites to bringing an action [under CWA], the district court has jurisdiction to decide whether a permit is required for a discharge even if the EPA has determined otherwise.")

Plaintiff also argues that the District, the state agency, responsible for implementing CAA is not a required party. This is correct. *See Vanderham II*, 2006 U.S. Dist. LEXIS 96061 at *28 ("In both *Weiler* and *Taylor Res.*, a citizen suit was brought against defendants who had been told by the appropriate permitting agency that various permits were not required.[citation] In neither *Weiler* nor *Taylor Res.* was the

_____

Administrator or a State with respect to such a standard or limitation,

42 U.S.C. § 7604(a)(1).

Under the CWA citizen suit provision, it states, in relevant part,

(a) Authorization; jurisdiction
Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf--
(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

33 U.S.C. § 1365(a)(1).

19

1   presence of the governmental agency required."); *Association to*

2   *Protect Hammersley, Eld, & Trotten Inlets v. Taylor Resources*,

3   **299 F.3d 1007, 1012 (9th Cir. 2002) ("We adopt the views of the**

4   **Second Circuit and the District of Columbia Circuit in Clean Air**

5   **Act cases where they accepted citizen suits without requiring**

6   **joinder of a responsible government agency. In those Clean Air**

7   **Act cases, it was the EPA that was not joined; in our Clean Water**

8   **Act case, it is the delegated state agency that is not joined and**

9   **that previously had determined that an NPDES permit is not**

10  **required. The principle is the same: Whether a citizen is seeking**

11  **to enforce the terms of an NPDES permit or a pollution abatement**

12  **plan or, as here, the statutory requirements of the Clean Water**

13  **Act, it is the government agency's alleged failure to act that**

14  **brings the citizen suit into play.");** *Weiler v. Chatham Forest*

15  *Products*, **392 F.3d 532, 537-539 (2d Cir. 2004).**

16       **Defendants' motion to dismiss on mootness grounds is DENIED**

17       **C.    Exhaustion of Administrative Remedies**

18       **Defendants also assert in their Supplemental Reply that**

19  **Plaintiff has failed to exhaust it administrative remedies and**

20  **"did not, and had not, appealed the District's determination**

21  **pursuant to California Health & Safety Code section 42302.1."**

22  **(Doc. 254, Suppl. Reply, p. 3:7-8)  However, the CAA does not**

23  **contain an express requirement of exhaustion of state remedies.**

24  **The CAA citizen suit provision provides that "district courts**

25  **shall have jurisdiction, without regard to the amount in**

26  **controversy or the citizenship of the parties, to enforce an**

27  **emission standard or limitation." 42 U.S.C. § 7604(a).  The only**

28  **requirement under the CAA citizen suit provision is the 60-day**

notice requirement.  AIR asserts that it sent on April 19, 2007, a 60-day notice to the Dairy "to enforce section 112, 42 U.S.C. § 7412, pursuant to § 304(a)(1) of the Act, 42 U.S.C. § 7604(a)(1)."  The letter is attached to the Complaint and is undisputed in this motion. (Doc. 153, Complaint, ¶ 13, Exhibit 3).  In *Association of Irritated Residents v. C&R Vanderham,* 435 F.Supp.2d 1078, 1088 (E.D. Cal. 2006) (*Vanderham I*), the Court also stated the same: "With respect to a statutory mandate, the text of § 7604 does not contain an express exhaustion of state remedies requirement." *cf. Citizens for a Better Env't v. Union Oil Co.,* 83 F.3d 1111, 1119 (9th Cir. 1996) ("Furthermore, 33 U.S.C. § 1365 [CWA citizen suit provision] makes no mention of exhaustion of state remedies as a prerequisite for bringing a citizen suit.")

Defendants appear to concede this point in their Supplemental Reply: "While some courts have required that there be a statutory exhaustion of state remedies, that is not the case here." (Doc. 254, Suppl. Reply, p. 5:7-8)  Defendants however, are requesting a judicially imposed exhaustion requirement. Defendants argue that the District rules provide a procedure to appeal the issuance of a permit, citing to Cal. H&S Code § 42302.1[11]; District Regulation V, Rules 5010 *et seq.*  Defendants

---

[11] Within 30 days of any decision or action pertaining to the issuance of a permit by a district, or within 30 days after mailing of the notice of issuance of the permit to any person who has requested notice, or within 30 days of the publication and mailing of notice provided for in Section 1 of Chapter 1131 of the Statutes of 1993, any aggrieved person who, in person or through a representative, appeared, submitted written testimony, or otherwise participated in the action before the district may

contend that Plaintiff could have filed a petition to challenge the District's issuance of the ATC permit and determinations therein and the District's Hearing Board would have been required to hold a hearing within thirty days of the filing of Plaintiff's petition.  Defendants argue that the District would have been able to develop the necessary factual background, apply any special expertise and correct its own errors.  While these arguments are compelling, Congress's failure to require exhaustion of administrative remedies is instructive.

Congress declined to require exhaustion of administrative remedies under the citizen suit act of the CAA, and provided more than one avenue for citizens to challenge alleged violations under the CAA.  The Ninth Circuit in *Taylor*, addressing the citizen suit provision under the CWA, noted that the state agency in charge of issuing the permit did not possess exclusive authority to decide violations under the CWA.  "Although the EPA or an authorized state agency may be charged with enforcement of the Clean Water Act, neither the text of the Act nor its legislative history expressly grants to the EPA or such a state agency the exclusive authority to decide whether the release of a substance into the waters of the United States violates the Clean

---

request the hearing board of the district to hold a public hearing to determine whether the permit was properly issued. Except as provided in Section 1 of Chapter 1131 of the Statutes of 1993, within 30 days of the request, the hearing board shall hold a public hearing and shall render a decision on whether the permit was properly issued.

22

Water Act." *Taylor,* 299 F.3d at 1012.  The *Vanderham II*, 2006 US Dist. LEXIS 96061, at *33, Court's decision is instructive in that AIR did not challenge the District's decision nor was the District sued. The *Vanderham II* Court held that "[d]espite the District's determination that Vanderham required no ATC permit and the absence of the District from this suit, AIR may pursue its claims under 42 U.S.C. § 7604(a)(1) for violations of the SIP (District Rules 2010 and 2201) in this Court." *Id.*

The only requirement for filing a citizen suit is the 60-day notice, an express procedural requirement, requiring the plaintiff to provide notice of the alleged violation to the EPA, the State and to the alleged violator.  The CAA citizen suit provision does not have a requirement that a state agency in charge of implementing portions of the CAA be sued if a citizen is challenging a provision under the CAA..

> **(b) Notice**
> No action may be commenced--
> **(1)** under subsection (a)(1) of this section--
> **(A)** prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

42 U.S.C. § 7604(b)(1)(A).  The only restriction imposed by Congress is if either the EPA Administrator or the State decides to bring an enforcement action within the sixty days, the citizen suit provision forbids a plaintiff from bringing an independent action. 42 U.S.C. § 7604(b)(1)(B).

Here, the Air Pollution Control Officer of the District was provided with Plaintiff's sixty days' notice but the District did not bring an enforcement action and therefore, AIR proceeded on

23

1  its own. (Doc. 153, Complaint, Exhibit 3, April 19, 2007 60-day

2  Notice Letter, p. 7)  The sixty-day notice gave the District an

3  opportunity to address the allegation that the Dairy was to

4  "construct a major source" and therefore require a MACT

5  determination.  The District declined to take any action or start

6  proceedings to address this allegation.  That is all the CAA

7  citizen suit provision requires and while Defendants' arguments

8  are persuasive, they do not overcome the broad language of the

9  citizen suit language and the non-exclusive role of the State

10  Agency under the CAA.

11      Defendants' motion to dismiss on exhaustion grounds is

12  DENIED.

13      D.   Primary Jurisdiction and Fair Notice

14      Defendants' Motion to Dismiss also advances two additional

15  arguments (1) primary jurisdiction rested with the District and

16  (2) Defendants did not have fair notice.[12]

17          I.   Primary Jurisdiction

18      Defendants argue that the District and the EPA have primary

19  jurisdiction over these technical issues raised in Plaintiff's

20  third cause of action.  In response, Plaintiff contends that this

21  case does not meet the criteria application of the primary

22  jurisdiction doctrine and specifically, the CAA does not allow

23  for primary jurisdiction.

24

25

26      [12] Defendants are no longer seeking a stay of the suit
pending a determination by the District, as the District has made
27  its determination in the recently issued ATC permit. See Doc.
218, Reply, p. 11:7-10.
28

1    Defendants cite to four factors under Ninth Circuit
2  authority to establish primary jurisdiction: (1) the need to
3  resolve an issue that (2) has been placed by Congress within the
4  jurisdiction of an administrative body having regulatory
5  authority (3) pursuant to a statute that subjects an industry or
6  activity to a comprehensive regulatory authority that (4)
7  requires expertise or uniformity in administration. *Syntek*
8  *Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th
9  Cir. 2002).  Primary jurisdiction applies where "Congress, in
10  enacting a regulatory scheme, intends an administrative body to
11  have the first word on issues arising in judicial proceedings."
12  *U.S. v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir.
13  1987).  Because no approved emission factors for determining
14  emissions of methanol from dairies were available at the time of
15  construction of the Dairy, Defendants contend that the
16  determination of whether the Dairy is a major source should wait
17  until the EPA or the District makes such a determination.
18  Defendants in addition, contend that the Court in making a
19  determination of whether the Dairy is a major source of HAP would
20  be establishing emission estimating methodology for all dairies
21  that would require scientific and technical expertise.

22    Plaintiff responds that the primary jurisdiction doctrine
23  undermines Congress's enforcement scheme under the CAA and this
24  Court should follow the lead of other District Courts that have
25  not found primary jurisdiction under the CAA.  Plaintiff also
26  contends that Congress did not give the EPA or the States the
27  exclusive role in determining emissions from sources of pollution
28  and a court can and should weigh expert testimony including

1  testimony on whether the Dairy emits more than ten tons per year
2  of methanol.   There is no need to defer to agencies on this
3  issue.

4       Plaintiff cites several CAA cases addressing the primary
5  jurisdiction doctrine under the CAA, CWA and RCRA.   While no
6  Court has directly addressed whether the primary jurisdiction
7  applies in a § 112(g)(2)(B) CAA suit, the cases are nonetheless
8  instructive that the doctrine of primary jurisdiction does not
9  apply in this suit and the general direction is to not apply the
10 doctrine.   A Kansas District Court in *Anderson v. Farmland*
11 *Industries,* 45 F.Supp.2d 863 (D. Kan. 1999), addressed the
12 doctrine of primary jurisdiction in a citizen suit brought under
13 the CAA for the alleged underreporting of emissions.   Relying on
14 decisions brought under the CAA and RCRA, the Court declined to
15 apply the doctrine arguing that the CAA expressly provides
16 conditions under which a citizen suit is barred (*e.g.* formal
17 proceedings brought by the state).   The Court also stated that
18 its determination of whether emissions were being underreported
19 was within its competence to determine and such determination
20 would not duplicate the agency's role.   The Court further noted
21 that to apply such doctrine would frustrate the purpose of the
22 CAA since Congress pre-established the jurisdiction between
23 Courts through the citizen suit notice provisions.   "As set forth
24 above, plaintiffs essentially are seeking an order precluding
25 defendant from violating the Clean Air Act and its regulations."
26 *Id.* at 868.   Similarly *L.E.A.D. Group of Berks v. Exide Corp.*,
27 Civ. No. 96-3030, 1999 U.S. Dist. LEXIS 2672, 1999 WL 124473 (D.
28 Pa. Feb. 19, 1999), a Pennsylvania District Court decision is

instructive in that the Court stated in response to a suit
alleging violations under the CAA and CWA:

> In determining liability under the CWA or CAA, there
> are no determinations which require technical or policy
> considerations because we need only decide whether
> Defendants have violated the limitations required by
> their NPDES or air quality permits. Finally, there is
> no substantial danger of inconsistent rulings or a risk
> of interfering with federal and state administrative
> oversight because Congress has expressly set forth
> situations in which a citizen suit is precluded for
> those reasons under the CWA, see 33 U.S.C. §
> 1365(b)(1), and the CAA, see 42 U.S.C. § 7604(b)(1).

*Id.* at *21.  The Court observed that to apply the doctrine of
primary jurisdiction would greatly reduce the instances in which
a plaintiff could pursue such an action to facilitate broad
enforcement of the environmental protection laws and regulations.
The case was a simple issue of whether Defendant *Exide* violated
provisions of statute and applicable federal rules.

The Colorado District Court in *Sierra Club v. Tri-State
Generation and Transmission Ass'n, Inc.,* 173 F.R.D. 275 (D. Colo.
1997), also addressed a citizen suit brought under the CAA and
the Colorado Air Quality Control Act: "Like the majority of these
courts, I find that applying the doctrine of primary jurisdiction
to citizen suits would frustrate Congress's intent, as evidenced
by its provisions for citizen suits, to facilitate broad
enforcement of environmental-protections laws and regulations."
*Id.* at 284; *see also Paper, Allied-Indus., Chemical and Energy
Workers Intern. Union v. Continental Carbon Company*, No.
CIV-04-438-F, 2005 WL 1389431, at *15 (W.D. Okla. Jun. 10, 2005)
("The majority of federal cases addressing the issue have found
the doctrine of primary jurisdiction to be inapplicable to suits
brought under the citizen suit provisions of the CAA."); *Sierra*

27

*Club v. El Paso Gold Mines, Inc.*, 198 F. Supp. 2d 1265, 1271 (D. Colo. 2002) (*overruled on other grounds*) ("I am not persuaded on the record before me that the doctrine of primary jurisdiction applies to this citizen suit [under the CWA] ... The court is competent to determine whether the defendant has been 'discharging' 'pollutants' from a 'point source' into 'navigable waters' without a permit ... Expert testimony will assist the court in resolving any complex technical issues presented."); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (refusing to apply doctrine to action filed under RCRA), *cert. denied*, 142 L. Ed. 2d 772, 119 S. Ct. 871 (1999); *Williams v. Alabama DOT*, 119 F. Supp.2d 1249, 1256 (M.D. Ala. 2000) ("Primary jurisdiction is particularly inappropriate in situations involving a statute like RCRA, which expressly allow for citizens to bring suit in order to ensure uniform enforcement of federal environmental laws."); *but see Davies v. National Co-op. Refinery Ass'n*, 963 F. Supp. 990 (D. Kan. 1997) (applying doctrine to action filed under RCRA when agency was in the midst of its remediation effort and because the relief the plaintiff sought would have undermined that effort).

In *Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1170 (D. Wyo. 1997), a citizen suit brought under RCRA and CWA, the District Court addressed the doctrine of primary jurisdiction, specifically the Court's alleged lack of expertise and the Court's obligation to hear the suit:

> Determinations regarding the adequacy of groundwater and contaminant sampling and appropriate remediation techniques are not dealt with by courts on a daily basis. That fact alone, however, is not a sufficient basis for denying jurisdiction. It must be shown that

courts in general lack the competence to efficiently and effectively resolve the issue. Other courts have held, and this Court agrees, that questions posed by RCRA and the CWA are not so esoteric or complex as to foreclose their consideration by the judiciary... There is an additional, overriding reason for courts to hear RCRA and CWA cases despite their supposed unique nature: Congress has told us to. Both RCRA and the CWA explicitly empower citizens to enforce the Acts' provisions except in certain circumstances not present here. This Court could not in good faith unilaterally strip United States citizens of rights given them by their government.

*Id.* at 1170; *see also Committee to Save Mokelumne River v. East Bay Mun. Util. Dist.*, NO. CIV. S-91-1372 LKK, 1993 U.S. Dist. LEXIS 8364, at * 29 (E.D. Cal. Mar. 2, 1993) (CWA suit where the Court declined to invoke the doctrine of primary jurisdiction: "Deferring to the EPA proceeding on the basis of primary jurisdiction in this case would undermine the citizen suit provision of the Act as the primary enforcement mechanism for water pollution regulation. [citation]  As has been observed, given Congress' judgment, the doctrine of primary jurisdiction should be invoked sparingly where it would serve to preempt a citizen's suit.")

Here, Defendants have not shown that it was Congress's intent to grant primary jurisdiction to the District and EPA to the exclusion of the courts.  On the contrary, the citizen suit provision provides limitations and Congress has shown its intent on balancing the role of the EPA, the District and the Courts to address violations under the CAA.  Congress has provided broad federal enforcement powers to citizens.  In addition, Defendants have failed to show the Court does not have the competence and ability to effectively resolve CAA issues.  And to abstain from addressing CAA violations because of the involvement of

29

scientific and technical expertise, would foreclose many of the
citizen suits filed, as the CAA regularly involves
specialization, technical and scientific expertise that would in
most cases support the administrative agency deciding the issue.
Congress, long-aware of this issue, has not prohibited Courts
from addressing such suits under the CAA.  A finding by the Court
that the Dairy is a major source of HAP does not conflict with
any orders or plans of the EPA or District.  Neither the EPA nor
the District have brought an enforcement action against the
Dairy.

    As *Wilson* states: "In short, Defendants would have this
Court wield the tool of primary jurisdiction to surrender its
statutorily imposed duty to entertain and decide this action.
Such an application of that doctrine would do injustice to the
equally long-standing principal that Courts of the United States
'have no more right to decline the exercise of jurisdiction which
is given, than to usurp that which is not given. The one or the
other would be treason to the Constitution .'" 989 F.Supp. at
1170. (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 403, 5
L.Ed. 257 (1821)).  Defendants have not established that the
factors of primary jurisdiction are present.

    Defendants' motion to dismiss on primary jurisdiction
grounds is DENIED.

              II.  Fair Notice

    Defendants also move to dismiss Plaintiff's third cause of
action on the ground that there was a lack of fair notice,
specifically lack of knowledge of the emission factors to
determine if the Dairy was emitting more than the permitted

amount of HAP.  Plaintiff rejoins that the Fair Notice doctrine is not applicable; the lack of emission factors at the time of the construction is not dispositive as to Fair Notice.

Due process requires that an agency provide "fair notice of what conduct is prohibited before a sanction can be imposed." *Stillwater Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 142 F.3d 1179, 1182 (9th Cir.1998) (quoting *Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir.1996)); *Phelps Dodge Corp. v. FMSHRC*, 681 F.2d 1189, 1193 (9th Cir.1982) (finding that relevant safety standard under Federal Mine Safety and Health Review Commission was aimed at preventing electrical shock and did not provide fair notice that it was applicable to  non-electrical portion of equipment).  "Due process requires that parties receive fair notice before being deprived of property." *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir.1995)  "In the absence of notice-for example, where the regulation is not sufficiently clear to warn a party about what is expected of it-an agency may not deprive a party of property by imposing civil or criminal liability." *Id.*  Sufficient notice is given when a "person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).[13]

_____

[13] *Grayned* addressed the fair notice doctrine in the criminal context, an area of the law where it most often arises, and noted three important reasons for due process protection in the face of a law that is vague.  Two of the three factors are important, the third addresses an issue related to the First Amendment.  One, is the concern that vague laws "may trap the

Fair notice challenges are most common in the criminal context, the "no punishment without notice" rule, and regarding challenges to a regulation, the most common challenge to the agency's interpretation of the regulatory language. *See General Elec. Co. v. U.S. E.P.A.,* 53 F.3d 1324, 1329 (D.C. Cir. 1995). Here, Defendants do not challenge the agency's interpretation of the regulation or the regulation language itself - because the regulation language is clear: if Defendants emit more than ten tons of any HAP per year, they are subject to a MACT determination.  Methanol is a listed HAP and is emitted by dairies.  Rather, Defendants claim lack of fair notice, because there were no emission factor standards for determining *if* they emit more than ten tons per year, as stated by the regulation.

Defendants argue that they did not have fair notice of CAA section 112(g)(2)(B) requirements because there were no emission factors established by the EPA or the District, let alone an explicit emission factor test for determining whether the Dairy emitted more than 10 tons per year of methanol (making it a major source of HAP subject to a MACT determination under CAA § 112(g)(2)(B)) prior to the construction of the Dairy in 2004. Defendants cite for support Plaintiff's previously filed motion for leave to amend arguments in which Plaintiff alleged that research released by the California Air Resources Board in June 2006 formed the basis for its assertion that Defendants were

innocent by not providing fair warning." *Id.* at 108.  Second, is the if "arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.*

32

required to undergo a case-by-case MACT determination for methanol for the Dairy because they had the potential to emit more than 10 tons per year of methanol.  This evidence had apparently become publicly available in the summer or fall of 2006.  Defendants use this allegation and information proffered by Plaintiff in its earlier motion for leave to amend, to demonstrate that the Dairy could not have known before construction began and at the time of construction of the Dairy, in the early part of 2004, the emission factors necessary to make a determination that it was to "construct a major source" of HAP requiring a MACT determination.

Defendants rely on a District Court of Columbia District case *General Electric v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995). Fair notice is given if "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *General Electric,* 53 F.3d at 1329; *see e.g. Hoffman Const. Co. v. Occupational Safety and Health Review Com'n,* 546 F.2d 281 (9th Cir. 1976) (finding the regulation that requires the employer provide protective equipment where a need for such gear is created, did not provide a specific standard, as the need for such gear arises when the need arises and therefore such standard is vague).

An Indiana District Court addressed the doctrine of fair notice, *U.S. v. Cinergy Corp.*, 495 F.Supp.2d 892 (S.D. Ind. 2007), in a suit brought by the government against gas and electric companies for alleged violation of the CAA new source

1   review permit provisions, in which the defendants argued they did

2   not have fair notice of the EPA's interpretation of the standards

3   for routine maintenance, repair or replacement exclusion (RMRR)

4   and standards for determining whether their projects would cause

5   significant emissions increases.   The defendants fair notice

6   defense failed for several reasons, and the Indiana Court cited

7   several factors relevant to determine whether a regulated party

8   has fair notice of an agency's interpretation of its regulations:

9   (1) plain language of the regulation; (2) other public statements

10  by the agency; (3) consistency of agency's public statements; (4)

11  an agency's pre-enforcement efforts; and (5) whether a confused

12  party makes an inquiry about the meaning of the regulation. *Id.*

13  at 900-901; *General Electric v. EPA*, 53 F.3d 1324, 1329-34 (D.C.

14  Cir. 1995).

15       The fair notice doctrine, Plaintiff argues does not require

16  regulators to provide notice of the factual means to determine

17  compliance with the law.   Further, the CAA is a strict liability

18  statute making Defendants' knowledge or intent on the part of

19  Defendants irrelevant for liability purposes.   The Dairy had

20  notice of methanol emissions, as studies and reports documenting

21  methanol emissions from livestock predate the Dairy's 2004

22  construction.

23       In determining if a regulation violates the fair notice

24  doctrine, courts have considered the plain language of the

25  regulation itself to determine if the defendant had fair notice

26  or lack of fair notice of how the administrative agency would

27  interpret the regulation. *See U.S. v. Approximately 64,695 Pounds

28  of Shark Fins,* 2008 WL 696907 at *3-4 (9th Cir. Mar. 17, 2008);

**34**

*Gates & Fox Co. v. Occupational Safety and Health Review Commission*, 790 F.2d 154, 155-156 (D.C. Cir. 1986)(finding Gates & Fox were not given adequate notice. The OSHA regulation requiring employers to provide emergency breathing equipment for employees in "advancing face" of tunnel and "areas where employees might be trapped" could reasonably be read to refer to areas near advancing face only; OSHA failed to "give fair notice" that such equipment was necessary in all area where employees might be trapped.)  "[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).  There is a strong presumption that regulations are not unconstitutionally vague if the regulated party has the means of obtaining clarification either by making inquiry or through an administrative process. *Id.* at 498.[14]

Here the plain language of the regulation provides sufficient notice to Defendants of their obligations under the CAA.  The standard existed.  The Dairy could not "construct a

[14] "The degree of vagueness that the Constitution tolerates-as well as the relative importance of fair notice and fair enforcement-depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-499.

major source" of HAP unless the District or the EPA determined the MACT limitation would be met. 42 U.S.C. § 7412(g)(2)(B).   The agency provide regulations identifying a "major source."   The regulations provided that to "construct a major source" includes any stationary source(s) which "emits or has the potential to emit 10 tons per year of any HAP's or 25 tons per year of any combination of HAP..." 40 C.F.R. § 63.41.   Methanol is listed as a HAP. 42 U.S.C. § 7412(b)(1).   There is no legal authority provided that it was the responsibility of the state or the EPA to calculate the emissions.   It was the responsibility of the Dairy, who chose to operate in this industry and is knowledgeable that cows cause emissions that effect air quality to determine the type of emissions and the quantity of such emissions.   The Dairy may not know the amount, but since it is in this business it is their responsibility to calculate by reasonable means necessary the emissions of the Dairy.   There is no ambiguity in the language.   Defendants do not allege that they attempted to make any calculations on whether they emitted more than ten tons per year of methanol prior to construction of the Dairy and have not alleged they requested an applicability determination from the District prior to construction.   Defendants have not alleged that any calculations are so esoteric that no reasonable dairy operator or owner with the assistance of a knowledgeable expert would not be able to verify the emissions from its dairy. Further, Defendants have not provided any case law requiring the EPA or the District to provide information on how to calculate the emissions from the Dairy.

36

1  **A further inquiry remains which has not been fully briefed:**
2  **Does the Fair Notice doctrine even apply in this type of**
3  **challenge?  Since even if the EPA or the District published**
4  **emission factors, the EPA and the District do not have the**
5  **exclusive authority under the CAA to determine if a party is in**
6  **violation of 112(g)(2)(B), and a party could bring a suit in**
7  **federal court, similar to the permitting cases, finding that a**
8  **MACT determination is required, even though the District found it**
9  **was not required.**

10  **Defendants' motion to dismiss on fair notice grounds is**
11 **DENIED.**

12  **CONCLUSION**
13  **Defendants' motion to dismiss is DENIED.**

14
15 IT IS SO ORDERED.
16 **Dated:    March 28, 2008**          **/s/ Oliver W. Wanger**
17                                      UNITED STATES DISTRICT JUDGE

**37**